## BRAVERMAN *v.* BAR ASSOCIATION OF BALTIMORE CITY

[No. 108, October Term, 1955.]

330

*Decided March 13, 1956.*

The cause was argued before BRUNE, C. J., and DELA-
PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Harold Buchman,* for appellant.

*Howard H. Conaway* and *Charles E. Orth, Jr.,* for ap-
pellee.

Brief *amicus curiae* of National Lawyers Guild, filed by *Osmond K. Fraenkel.*

DELAPLAINE, J., delivered the opinion of the Court.

Maurice Braverman, who was admitted by the Court of Appeals of Maryland to the bar of this State on October 7, 1941, has appealed here from an order of the Supreme Bench of Baltimore City disbarring him from the practice of law.

The Supreme Bench acted upon a petition filed by the Bar Association of Baltimore City on October 8, 1953. The petition contained the following allegations: (1) that appellant was admitted to practice before the Supreme Bench on November 1, 1941, when he took the oath required of attorneys; (2) that on April 1, 1952, he was convicted in the United States District Court for the District of Maryland of the crime of conspiracy to violate Section 2 of the Smith Act, 18 U. S. C. A., sec. 2385, and he was sentenced on April 4, 1952, to pay a fine of $1,000 and to be imprisoned for a period of three years; and (3) that the Executive Committee of the Bar Association, acting upon the recommendation of the Grievance Committee, adopted a resolution that a proceeding be filed with the Supreme Bench for disciplinary action against him.

Appellant filed a demurrer alleging that neither the petition of the Bar Association nor the record of the case in the District Court contained any sufficient ground for disciplinary action against him.

Section 2 of the Smith Act provides as follows:

"Whoever knowingly or willfully advocates, abets, advises, or teaches the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof, or the government of any political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or

"Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or attempts to do so; or

"Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction."

On January 15, 1952, appellant and five others were indicted for conspiring to commit offenses against the United States by (1) advocating and teaching the duty and necessity of overthrowing the Government of the United States by force and violence; and (2) by organizing and helping to organize, as the Communist Party of the United States, a society, group, and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence. The indictment specifically charged that appellant attended and participated in meetings of the Maryland District of the Communist Party in Baltimore on August 14, 1948, August 16, 1948, February 4, 1949, and March 19, 1949.

In March, 1952, the defendants were tried before Judge Chesnut and a jury. On April 1 the jury found the de-

fendants guilty. On April 4 Judge Chesnut imposed the sentence upon appellant.

The defendants appealed, and the case was argued before the United States Court of Appeals for the Fourth Circuit on July 1, 1952. On July 31, 1952, the Court affirmed the judgment. *Frankfeld v. United States,* 4 Cir., 198 F. 2d 679, 684, 685.

Chief Judge Parker, speaking for the Court, said in the course of the opinion:

"The contention of the government on the trial was that the Communist Party of the United States had as its objective the overthrowing of the government of the United States by force and violence as speedily as circumstances would permit and that the defendants were active members and officers of the party, participated in its purposes and gave it active support with knowledge of its unlawful objective. We think that this contention was amply supported by the testimony.

"With respect to the purposes and activities of the Communist Party of the United States, there was evidence of a number of witnesses that it was actively teaching and advocating the overthrow of the government by force and violence and the establishment of a dictatorship of the proletariat, as soon as circumstances would permit, and that it was training a hard core of party membership in methods of seizing and holding power and directing the course of revolution when a favorable opportunity for seizing power should arrive. * * *

"There was abundant evidence, not only that the Communist Party printed and circulated the revolutionary classics of communism, advocating the class struggle and the forcible seizure of power by the proletariat, but also that the party maintained schools in which members were indoctrinated in the principles and policies of the

party and were instructed in the techniques to be followed in overturning existing governments and in seizing and holding power. Some members of the party were sent to Moscow for instruction; others were sent to schools maintained in New York City; and classes for instructing party members were maintained in Baltimore and other cities. Plans were made for infiltrating the army and navy with communists and to place communists in key labor positions in important industries."

The petition of the Bar Association was heard before the Supreme Bench on June 20, 1955. The Bar Association offered in evidence a certified copy of the indictment of appellant and the docket entries of his conviction. Appellant offered a transcript of the trial of the case. On June 28 the Supreme Bench passed the order disbarring appellant from the further practice of law.

## I.

At the outset appellant complained that the petition of the Bar Association did not specifically allege which ground of disbarment it relied upon for disciplinary action, and hence he did not have fair notice of what to meet.

The Maryland disbarment statute, as amended by the Legislature in 1952, Laws 1952, ch. 27, Code Supp. 1955, art. 10, secs. 13, 16, 17, provides as follows:

"Charges of professional misconduct, malpractice, fraud, deceit, crime involving moral turpitude, or conduct prejudicial to the administration of justice, against any attorney at law may be filed in any court where such attorney is admitted to practice by any bar association acting through its appropriate committee * * *. In addition, any bar association of the State, acting through its appropriate committee, may file charges of being a subversive person, as defined by the Subversive Activities Act of 1949, against any attorney at law, in any court where such attorney is admitted to practice * * *.

"Every attorney who shall, after having an opportunity to be heard, * * * be found guilty of professional misconduct, malpractice, fraud, deceit, crime involving moral turpitude, conduct prejudicial to the administration of justice, or of being a subversive person, as defined by the Subversive Activities Act of 1949, shall, by order of the judges finding him guilty, be suspended or disbarred from the practice of his profession in this State.

"Every attorney who shall, after a hearing held as hereinbefore prescribed, be found guilty of professional misconduct, malpractice, fraud, deceit, crime involving moral turpitude, conduct prejudicial to the administration of justice, or of being a subversive person, as defined by the Subversive Activities Act of 1949, shall have the right of appeal to the Court of Appeals of Maryland, as in civil cases, except the Court of Appeals shall have the right to review the entire proceedings and affirm, modify, alter or reverse the order from which said appeal is taken as the substantial merits of the cause and the ends of justice may require."

The action of a court in exercising its power to disbar or suspend an attorney is judicial in character, but the inquiry is in the nature of an investigation by the court into the conduct of one of its own officers, and is not the trial of an action at law, as the order which is entered is only an exercise of the disciplinary jurisdiction which a court has over its officers. It is recognized in this State and generally in America that in such an investigation, mere forms not affecting its merits should not stand in the way of protecting the court and the public by appropriate action after a full hearing. *In re Williams*, 180 Md. 689, 23 A. 2d 7, 11.

In *Randall v. Brigham*, 7 Wall. 523, 19 L. Ed. 285, 293, the Supreme Court of the United States, speaking through Justice Field, commented on this practice as follows:

"It is not necessary that proceedings against attorneys for malpractice, or any unprofessional conduct, should be founded upon formal allegations against them. Such proceedings are often instituted upon information developed in the progress of a cause; or from what the court learns of the conduct of the attorney from his own observation. Sometimes they are moved by third parties upon affidavit; and sometimes they are taken by the court upon its own motion. All that is requisite to their validity is that, when not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney, of the charges made, and opportunity afforded him for explanation and defense. The manner in which the proceeding shall be conducted, so that it be without oppression or unfairness, is a matter of judicial regulation."

The usual practice in proceedings to disbar attorneys in State courts is to make written charges or allegations of misconduct. The specific offense charged should be set out so that the attorney may be aware of the precise nature of the accusation he is to meet and may know how to defend. *Ex parte Bradley*, 7 Wall. 364, 19 L. Ed. 214; *People v. Amos*, 246 Ill. 299, 92 N. E. 857. However, no formal or technical allegations or descriptions of the alleged offense are necessary. *Gould v. State*, 99 Fla. 662, 127 So. 309, 69 A. L. R. 699; *In re Keenan*, 287 Mass. 577, 192 N. E. 65, 96 A. L. R. 679. A complaint against an attorney is sufficient if it is intelligible and informing enough to advise the court of the matters complained of, so that it can determine whether or not to institute an inquiry, and to inform the attorney of the accusations so as to enable him to prepare a defense. *State v. Peck*, 88 Conn. 447, 91 A. 274.

In the instant case the Bar Association of Baltimore City filed its petition with the Supreme Bench of Baltimore City on October 8, 1953, alleging specifically that ap-

pellant had been convicted of conspiracy to violate Section 2 of the Smith Act, and had been sentenced to pay a fine of $1,000 and to be imprisoned for three years. He was ordered to show cause, if any he had, on or before December 9, 1953, why disciplinary action should not be passed against him. Appellant moved for a stay of the proceedings, stating that he was then confined in the Federal Penitentiary in Lewisburg, Pennsylvania, but that he had applied for a parole and was eligible for release from prison in January, 1954. He was released from the Federal Reformatory at Petersburg, Virginia, on May 13, 1955. As appellant was not heard by the Supreme Bench until June 20, 1955, he had ample time to prepare his defense. He was diligently represented by two attorneys. We find no merit in the complaint that he did not have ample notice of what charge he had to meet.

## II.

Appellant contended that he was not guilty of any crime involving moral turpitude, and that the disbarment does not rest upon a proper finding of such guilt. He argued that his conviction in the District Court was not conclusive upon the Supreme Bench; and that the Supreme Bench should not impose disciplinary action until it finds from its own study of the record in the criminal case that the conviction was proper, although he admitted that it was not necessary to try the case again.

In many States there are statutes making the record of conviction of certain crimes conclusive of guilt in disbarment proceedings. In New York, for example, the Legislature enacted the following provision in the Judiciary Law: "Whenever any attorney and counsellor-at-law shall be convicted of a felony, there may be presented to the appellate division of the supreme court a certified or exemplified copy of the judgment of such conviction, and thereupon the name of the person so convicted shall, by order of the court, he struck from the roll of attorneys." Consol. Laws, c. 30, sec. 88, subd. 3, now McK. Consol. Laws, c. 30, Judiciary Law, sec. 90, subd. 4.

In *In re Kaufmann,* 245 N. Y. 423, 157 N. E. 730, 732, it appeared that Kaufmann and another lawyer had been convicted in the United States District Court for the Southern District of New York of the crime of conspiracy to make a false report to the Alien Property Custodian. The Appellate Division of the Supreme Court of New York disbarred them automatically upon proof of the conviction without independent ascertainment of the fact of guilt. In 1925, however, they were pardoned by President Coolidge. They thereupon applied for reinstatement as attorneys at law. New remedies were available under another provision of the Judiciary Law: "Upon the reversal of the conviction for felony of an attorney and counsellor-at-law, or pardon by the president of the United States or governor of this state, the appellate division shall have power to vacate or modify such order or debarment." Consol. Laws, c. 30, sec. 88, subd. 4, now Judiciary Law, sec. 90, subd. 5.

In accordance with that section, the two men, again claiming innocence, petitioned the Appellate Division to restore them to membership in the bar. The record made it plain that President Coolidge had granted the pardon because he was advised by his Attorney General that they were innocent. Their prayer was reinforced by distinguished judges and lawyers, who asserted a continued faith in them and a distrust of the justice of the verdict. In spite of the impressive challenge of the justice of the verdict in the District Court, the Appellate Division took the view that the verdict was conclusive and therefore refused to examine the evidence.

The New York Court of Appeals, reversing the orders of the Appellate Division, held that, as a result of the pardon by the President of the United States, the petitioners were entitled to have their fitness as members of the bar considered and determined. Chief Judge Cardozo said in the opinion of the Court:

"The statute (Judiciary Law, § 88, subd. 3) does indeed set bounds upon this freedom of inquiry as long as the conviction stands and the

convict is without a pardon. While those conditions last, a court of this state in disciplining an attorney accepts the record of conviction and refuses to go back of it. The impediments once removed, the range of scrutiny is as wide as it was at common law. No doubt the attorney seeking reinstatement has the burden of satisfying the court of his fitness to be restored to so honorable a fellowship. For the welfare and repute of the profession the order of disbarment stands until the presumption of its correctness has been persuasively rebutted. But the honor of the profession does not demand the sacrifice of the innocent. A pardon may in some conditions be a warning as significant as a judgment of reversal that the looms of the law have woven a fabric of injustice."

In other States the Courts have held the record of conviction conclusive of guilt even in the absence of a statute to this effect. In Massachusetts it is established that in a disbarment proceeding a conviction of the attorney is conclusive and the issue of guilt or innocence cannot be retried. In *In re Welansky,* 319 Mass. 205, 65 N. E. 2d 202, 204, an attorney was disbarred after he was convicted of involuntary manslaughter. He contended that a conviction of a felony following a plea of not guilty is not uncontradictable evidence of guilt. The Supreme Judicial Court of Massachusetts, speaking through Justice Wilkins, upheld the disbarment with the following comment:

"We think that the doctrine of *Silva v. Silva,* 297 Mass. 217, 7 N. E. 2d 601, ought not to enable a respondent attorney, after a conviction of crime that remains unpardoned, to retry in disbarment proceedings the question whether he was in truth guilty. Something different is involved than the logical consequences of guilt upon property rights or the like. A member of the bar whose name remains on the roll is in a

sense held out by the Commonwealth, through the judicial department, as still entitled to confidence. A conviction of crime, especially of serious crime, undermines public confidence in him. The average citizen would find it incongruous for the Commonwealth on the one hand to adjudicate him guilty and deserving of punishment, and then, on the other hand, while his conviction and liability to punishment still stand, to adjudicate him innocent and entitled to retain his membership in the bar."

It was likewise held by the Supreme Court of Pennsylvania in *In re Gottesfeld*, 245 Pa. 314, 91 A. 494, 495, that where an attorney at law was convicted in a Federal Court of conspiring to conceal assets from a trustee in bankruptcy and was sentenced, such judgment was conclusive, and the fact that he was guilty of the crime of which he was convicted could not be disputed by the attorney in a disbarment proceeding. Justice Stewart, speaking for the Court, there said:

"The doctrine of *res judicata* applies whether the judgment be in civil or criminal proceeding, and, once rendered, the party convicted may not thereafter dispute the truth thereby established. The appellant had no right to a further hearing on the question of his guilt. His guilt was a fact established by an unchallenged record of a court of competent jurisdiction, and was no longer open to dispute. A decree of disbarment followed necessarily. It was of no consequence that in committing the offense of which he was convicted appellant was exercising no function of his professional office. * * * Courts can command public confidence only as those who serve therein are themselves observant of the law which it is the duty of the courts to enforce."

The judgments of the Courts of the United States have invariably been recognized as upon the same footing, so

far as concerns the obligation created by them, with domestic judgments of the States, wherever rendered and wherever sought to be enforced. *Embry v. Palmer,* 107 U. S. 3, 2 S. Ct. 25, 31, 27 L. Ed. 346. Nevertheless, at the hearing below Chief Judge Niles told the attorney for appellant that he should leave the transcript. The Chief Judge said to the attorney: "As I understand it, the Court can find from Judge Chesnut's charge and the United States Court of Appeals' decision herein the facts that you really want us to learn." The attorney replied: "That's right. Those facts are contained in the facts summarization."

Appellant relied on several cases holding that a judgment of conviction for crime involving moral turpitude is not absolutely conclusive against an attorney in a disbarment proceeding on the ground of *res judicata.* One of these is *People ex rel. Attorney General v. Laska,* 101 Colo. 221, 72 P. 2d 693. That case was not an appeal, but was an original disbarment proceeding before the Supreme Court of Colorado. The Court held that if an attorney is convicted of a felony in Colorado, he is automatically disqualified from practicing law in Colorado; but if he is convicted in another State, and he alleges in his answer in the disbarment proceeding that he was not guilty and that he did not have a fair trial, the Court might make an independent inquiry as to the question of his guilt. Even in that case the Court made it clear that it would not make an independent inquiry except where there are "peculiar and unusual circumstances."

Another case cited by appellant was *State v. O'Leary,* 207 Wis. 297, 241 N. W. 621. That also was not an appeal, but an original proceeding brought by two attorneys before the Supreme Court of Wisconsin. The Court appointed a referee to hear the case. The lawyers moved that the case be referred back to the referee because no testimony was presented to establish their guilt other than the record of their conviction. The Court granted their motion, stating that a judgment of conviction for crime involving moral turpitude is not conclusive against

an attorney in a disbarment proceeding on the ground of *res judicata.* However, the Court declared that evidence of a conviction, which rests upon the finding of a jury that an attorney has been guilty of a crime involving moral turpitude, is evidence of his guilt and his unfitness to practice law, and also *prima facie* establishes both of those facts.

The present case comes to us on appeal from a decision of ten Judges of the Supreme Bench of Baltimore City, who gave consideration to the arguments of counsel and had the opportunity to read the decisions of the United States District Court and the United States Court of Appeals. The Judges of the Supreme Bench considered everything which appellant claimed was material and which he asked them to consider. Therefore, there is actually no need in this particular instance to state whether in a disbarment proceeding a judgment of conviction by another Court is conclusive or only *prima facie* evidence of guilt.

### III.

Appellant contended that a violation of the Smith Act is not a "crime involving moral turpitude." He contended that this Act created a novel "political crime." He argued that, although the Smith Act was enacted by Congress in 1940, it was not until June 4, 1951, subsequent to the Communist meetings which he was found guilty of attending, that conspiracy to violate the Smith Act could be authoritatively considered as a crime. It was on that day that the United States Supreme Court handed down the decision in *Dennis v. United States,* 341 U. S. 494, 71 S. Ct. 857, 867, 95 L. Ed. 1137. Appellant urged us to consider the dissenting opinions of Justice Black and Justice Douglas. He called special attention to Justice Black's opinion that Section 3 of the Act is a form of censorship of speech and press forbidden by the First Amendment. But we rely on the opinion of the Court, not on the dissenting opinions. The Court held the Smith Act constitutional. Chief Justice Vinson, delivering the opinion of the Court, declared:

"If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required. The argument that there is no need for Government to concern itself, for Government is strong, it possesses ample powers to put down a rebellion, it may defeat the revolution with ease needs no answer. For that is not the question. Certainly an attempt to overthrow the Government by force, even though doomed from the outset because of inadequate numbers or power of the revolutionists, is a sufficient evil for Congress to prevent."

Generally speaking, the conviction of an attorney of any criminal offense which the law characterizes as infamous establishes *prima facie* his unfitness to be continued on the rolls of members of the bar and is sufficient cause of disbarment. *State ex rel. McLean v. Johnson,* 174 N. C. 345, 93 S. E. 847; *Ex parte Mason,* 29 Or. 18, 43 P. 651, 54 Am. St. Rep. 772. The Maryland statute directs that every attorney who shall be found guilty of crime involving moral turpitude, or of conduct prejudicial to the administration of justice, or of being a subversive person, shall be suspended or disbarred from the practice of law. "Moral turpitude" consists of an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rule of right and duty between man and man. *Board of Dental Examiners v. Lazzell,* 172 Md. 314, 320, 191 A. 240, 109 A. L. R. 1453. There are statutes of this kind in many States. *In re Collins,* 188 Cal. 701, 206 P. 990, 32 A. L. R. 1062.

The question whether a particular crime involves moral turpitude within the meaning of the statute making such a crime a ground for disbarment is to be determined by a consideration of the nature of the offense as it bears

upon the attorney's moral fitness to continue in the practice of law. *In re Disbarment of Rothrock,* 16 Cal. 2d 449, 106 P. 2d 907, 131 A. L. R. 226.

In *Rheb v. Bar Ass'n of Baltimore City,* 186 Md. 200, 46 A. 2d 289, this Court held that failure to make income tax returns for the purpose of cheating the Government is a crime involving moral turpitude, and that it is immaterial whether the crime is classed as a felony or a misdemeanor.

In *In re Meyerson,* 190 Md. 671, 686, 59 A. 2d 489, we held that conspiracy to cause an abortion is a crime involving moral turpitude.

It has been held in other States that acts of sedition or disloyalty on the part of an attorney, if they violate a criminal statute, are sufficient grounds for disbarment. It has also been held that unpatriotic conduct and utterances not amounting to treason or to the violation of any statute or of the oaths and duties of an attorney do not subject him to disbarment; but anarchistic beliefs and opinions will subject an attorney to disbarment if expressions thereof are uttered under circumstances and in a manner calculated to lead others to violate and disregard existing laws. *Margolis' Case,* 269 Pa. 206, 112 A. 478, 12 A. L. R. 1186; *In re Kerl,* 32 Idaho 737, 188 P. 40, 8 A. L. R. 1259; *In re Clifton,* 33 Idaho 614, 196 P. 670, 19 A. L. R. 931.

There can be no question that a conspiracy to violate the Smith Act is not a minor offense, but a crime involving moral turpitude. Moreover, as we have mentioned, the statute also specifically authorizes suspension or disbarment of an attorney for "conduct prejudicial to the administration of justice." By this phrase the court is directed to consider conduct complained of in order to determine whether the attorney should continue as a practitioner of a profession which should stand free of all suspicion. We have definitely stated that this phrase should not be given a restricted meaning. *Rheb v. Bar Ass'n of Baltimore City,* 186 Md. 200, 46 A. 2d 289.

## IV.

Appellant next contended that the disbarment order deprives him of constitutional rights in violation of the First Amendment of the Constitution of the United States. The First Amendment prohibits the enactment by Congress of laws abridging freedom of speech, and has no application to the case before us. The right of free speech is not an unlimited, unqualified right, but the societal value of speech must on occasion be subordinated to other values and considerations.

In his opinion in *Frankfeld v. United States,* 198 F. 2d 679, 682, Chief Judge Parker emphatically stated:

> "The question presented is not one as to freedom of speech or as to the right to organize for proper political purposes, but goes to the power of the government to outlaw and punish conspiracies whose purpose is to overthrow the government itself by force and violence. Modern history is replete with instances of the danger to the government inherent in such conspiracies; and there is nothing in the Constitution or in any sound political theory which forbids it to take effective action against that danger. If it may take action to protect itself from being overthrown by force and violence, it necessarily follows that it may forbid conspiracies having that end in view and may punish such conspiracies as criminal. * * * They are pregnant with potential evil, which, while hidden from view in normal times, is likely to assert itself as an irresistible force when some national crisis presents an opportunity for a putsch or a coup d'etat."

Appellant also contended that the disbarment order violated Article 1 of the Maryland Declaration of Rights. This Article preserves to the people the right to alter, reform, or abolish their form of government in such manner as they may deem expedient.

It is obvious that there is no merit in this contention. In answer to a similar argument in the Supreme Court in

*Dennis v. United States,* 341 U. S. 494, 71 S. Ct. 857, 863, 95 L. Ed. 1137, Chief Justice Vinson said:

"The obvious purpose of the statute is to protect existing Government, not from change by peaceable, lawful and constitutional means, but from change by violence, revolution and terrorism. That it is within the *power* of the Congress to protect the Government of the United States from armed rebellion is a proposition which requires little discussion. Whatever theoretical merit there may be to the argument that there is a 'right' to rebellion against dictatorial governments is without force where the existing structure of the government provides for peaceful and orderly change. We reject any principle of governmental helplessness in the face of preparation for revolution, which principle, carried to its logical conclusion, must lead to anarchy. No one could conceive that it is not within the power of Congress to prohibit acts intended to overthrow the Government by force and violence."

Appellant further argued that the order violated the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States, and that it also violated Article 23 of the Declaration of Rights, which guarantees that no one shall be deprived of his life, liberty or property except by the law of the land. We must reject his argument that he was disbarred for causes not reasonably related to the regulation of the practice of law and hence was deprived of due process. At the time he was admitted to the bar by the Court of Appeals he took the oath that he would at all times demean himself fairly and honorably as an attorney and practitioner at law; that he would bear true allegiance to the State of Maryland, and support the laws and Constitution thereof; and that he would bear true allegiance to the United States, and that he would support, protect and defend the Constitution, laws and government thereof as the supreme

law of the land, any law or ordinance of this or any State to the contrary notwithstanding. He took a similar oath before the Supreme Bench of Baltimore City. He violated these oaths.

Appellant contended that the order of disbarment violated Article 17 of the Maryland Declaration of Rights. This Article declares: "That retrospective laws, punishing acts committed before the existence of such Laws, and by them only declared criminal are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed or required."

There is no question that Article 17 prohibits the enactment of *ex post facto* laws and the imposition of retrospective laws imposing a criminal penalty. But the prohibition of *ex post facto* laws applies only to criminal cases. There is no clause in the Maryland Constitution prohibiting retrospective laws in civil cases. *Diamond Match Co. v. State Tax Commission,* 175 Md. 234, 241, 200 A. 2d 365. It is also clear that a disbarment proceeding is not a criminal proceeding.

However, there is no merit in appellant's argument on this point for the particular reason that the acts for which he was convicted and for which he was disbarred were committed after the enactment of the Smith Act and the Maryland disbarment statute.

## V.

Appellant finally urged that, in view of the severe punishment he had suffered, disbarment would be unjust and would serve no useful purpose. He claimed that his professional life had been blameless; that he had been faithful to his oath as an attorney at law; and that whatever crimes he may have committed have been fully expiated.

The power to disbar is not an arbitrary one to be exercised at the pleasure of the court or from passion, prejudice, or personal hostility. It is the duty of the court to exercise this power by a sound judicial discretion whereby the rights of the bar may be carefully maintained by

the court. It should not disbar or suspend any attorney except where the continuance of the attorney in practice would be subversive of the proper administration of justice or incompatible with a proper respect of the court for itself or a proper regard for the integrity of the profession.

Ten Judges of the Supreme Bench of Baltimore City, after giving appellant a fair hearing, decided that he should be disbarred from the practice of law. We fully agree with the decision of the Supreme Bench. We have no hesitation in holding that the disciplinary action in this case should not be less than disbarment. The disbarment order will therefore be affirmed.

*Order affirmed, with costs.*