498 A.2d 679

Charles **ANDERSON**

v.

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE, et al.**

No. 544, Sept. Term, 1985.

Court of Special Appeals of Maryland.

Oct. 9, 1985.

George E. Burns, Jr., Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender and George Lipman, Asst. Public Defender, Baltimore, on brief), for appellant.

Susan Sugar Nathan, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, and C. Frederick Ryland, Special Counsel, Jessup, on brief), for appellees.

Argued before GILBERT, C.J., and WILNER, and ALPERT, JJ.

WILNER, Judge.

In 1984, the General Assembly rewrote the State insanity law. In doing so, it changed some of the procedures by which "insanity acquittees" (persons charged with crime but excused from criminal responsibility by reason of insanity) could seek and obtain release from judicially-ordered commitment to the Department of Health and Mental Hygiene (DHMH). The questions before us in this appeal are whether the Legislature intended those changes to apply to persons who, like appellant, were committed prior to the effective date of the new law, and, if so, whether such application would run afoul of Constitutional prohibitions against *ex post facto* laws.

At some point in "late 1980," appellant shot and killed his brother. On April 8, 1981, he was brought to trial in the Circuit Court for Baltimore City on a charge of first degree murder, to which he interposed a defense of insanity.

Under the law then in effect, once such a plea was filed and sufficient evidence was admitted to raise a doubt as to the defendant's sanity, it was incumbent on the State to prove beyond a reasonable doubt that the defendant was sane, *i.e.*, that he did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. *See* former Md.Code

Ann. art. 59, § 25 (1979 Repl.Vol.);[1] *Bradford v. State,* 234 Md. 505, 200 A.2d 150 (1964); *Bremer v. State,* 18 Md.App. 291, 307 A.2d 503, *cert. denied* 269 Md. 755 (1973), *cert. denied* 415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974). The requisite doubt was raised by appellant and the State apparently failed to meet its burden, for appellant was found not guilty by reason of insanity.

As an "insanity acquittee," appellant was then subject to the provisions of §§ 27–27C, 14, and 15 of art. 59. The first three of those sections, §§ 27–27B, dealt with the immediate handling of an "insanity acquittee"—whether he should be confined for treatment, released subject to certain constraining conditions, or released outright and unconditionally. The last three (§§ 27C, 14, and 15) assumed an initial confinement and dealt with how such a confined person could subsequently obtain release.

Section 27 provided that, upon an adjudication of insanity, the court would commit the defendant to DHMH for examination and evaluation. On completion of the evaluation, an evidentiary hearing would be held before a DHMH hearing officer. The purpose of the hearing, according to § 27A(a), was to consider the evaluation and other relevant information "to enable the hearing officer to make recommendations to the court" as to whether the defendant met the criteria for confinement—*i.e.,* whether he had a mental disorder and whether, by reason of that disorder, he would be a danger to himself or to others if released either outright or conditionally. At that hearing, the defendant had the right to be present, to be represented by counsel, to offer evidence, and to cross-examine adverse witnesses.

Upon completion of the hearing, the hearing officer would prepare and send to the court a report summarizing the evidence adduced at the hearing and containing the hearing officer's recommendations "as to each issue to be decided

---

1. All references in this Opinion to sections of art. 59 are to the sections as they appeared in the 1979 Repl.Vol. and 1980 Supp.

by the court." Because the hearing officer was not called upon to make specific findings, but only to summarize the evidence and make recommendations, there was no provision in § 27A for any burden or standard of proof at the administrative proceeding.

Section 27B permitted the State's Attorney and the defendant to file exceptions to the hearing officer's report. If such exceptions were timely filed, or if the court on its own initiative decided not to follow the hearing officer's recommendations, it was to conduct a hearing on the record made before the hearing officer and enter an appropriate order. Under § 27B(e) and (f), it is clear that the actual findings with respect to whether the defendant met the criteria for confinement were those of the court.[2] In that regard, § 27B(i) provided that "[a]ll findings by the court under subsections (e) and (f) of this section shall be upon clear and convincing evidence."

In accordance with those provisions, appellant was evaluated by DHMH; he had a hearing before a DHMH hearing officer; the hearing officer made a report to the court summarizing the evidence and recommending confinement for institutional inpatient treatment; and the court, employing the clear and convincing standard, concurred in the

---

**2.** Section 27B(e) provided:
 *"If the court finds* that the person has a mental disorder, and by reason of that mental disorder would be a danger to himself, or the person or property of others if not confined in an institution for in-patient care or treatment, it shall enter an order committing the person to the Department of Health and Mental Hygiene for institutional in-patient care or treatment." (Emphasis added.)
 Subsection (f) contained a similar provision with respect to conditional release.
 *See also* 3/14/79 Memorandum from Chairman of the Special Legislative Committee on Mental Health Laws to Senate Judicial Proceedings Committee with respect to 1979 Md.Laws, Ch. 701 (then SB 870) by which §§ 27–27C were enacted, noting that under § 27B, in contrast to the situation with respect to persons civilly committed, "the hearing officer in this procedure will not control the disposition of the case, but will advise the court by way of recommendation only."

hearing officer's recommendation and ordered appellant's confinement.

Appellant's rights thereafter, as noted, were governed by §§ 14, 15, and 27C of art. 59.

Section 14 afforded appellant an opportunity to seek release through *habeas corpus.* Subsection (a) provided that "[a]t any time, any person admitted to any facility [3] ... may apply to any appropriate court for a writ of habeas corpus. Such proceeding shall be available to determine the cause and the legality of his admission and continued detention."

Section 15, captioned "Judicial Release," provided for a special "sanity hearing." Subsection (a) permitted "any patient ... at any time" to file a petition in the equity court "for the purpose of securing his release." The issues to be determined in the proceeding were essentially the same as under § 27A dealing with initial commitment—"(1) Does the patient have any mental disorder; and (2) Is the disorder of such a nature that for the protection of himself or others, the patient needs inpatient medical care or treatment." § 15(d). The petitioner could elect to have those issues tried before a jury, "and thereafter, such trial shall proceed as in a civil action at law." § 15(c). If the trier of fact—court or jury—answered either question in the negative, "the petitioner shall be released from the facility...."

Under either of these proceedings, as the petitioner, the "insanity acquittee" necessarily bore the burden of proof; it was incumbent upon him to establish his eligibility for release by proving, by a preponderance of evidence, that he either did not have a mental disorder or, if he did, that it did not render him dangerous to himself or to others. *See Czaplinski v. Warden,* 196 Md. 654, 663–64, 75 A.2d 766 (1950), and *Graham v. State of Maryland,* 454 F.Supp. 643, 650 (D.Md.1978) with respect to a petitioner's burden in a

---

**3.** The term "facility" was defined in § 3(e) of art. 59 as including any hospital or other institution "which purports to or does provide treatment or other services for persons having any mental disorder."

*habeas corpus* proceeding and *Daniels v. Superintendent*, 34 Md.App. 173, 366 A.2d 1064 (1976), and *Dorsey v. Solomon*, 435 F.Supp. 725 (D.Md.1977), *aff'd in part, remanded in part*, 604 F.2d 271 (4th Cir.1979) with respect to the petitioner's burden in a § 15 proceeding.

Section 27C, first enacted only two years before appellant's commitment, provided, as an alternative to the judicial proceedings under §§ 14 and 15, the same kind of hybrid, or bi-level, proceeding afforded under §§ 27A and 27B. After six months of post-commitment confinement, an "insanity acquittee" could apply for release by "notifying the court and the State's attorney in writing of his request for an administrative hearing and judicial determination." § 27C(c)(i). Upon receiving such a notice, said § 27C(d), "the court shall notify [DHMH] to evaluate the person in accordance with the issues set out in § 27(c) within 20 days of the date of the notice. Upon completion of that evaluation, the persons shall have the rights enumerated in §§ 27A and 27B." Among other things, of course, that cross-reference to §§ 27A and 27B meant that the evidentiary hearing was before a DHMH hearing officer, that the hearing officer made no findings as to the defendant's eligibility for release but only a recommendation, that the court made the critical findings, and that a decision to retain the defendant in confinement had to be based upon clear and convincing evidence.[4]

---

**4.** When §§ 27–27C were first enacted in 1979, the standard of proof required in a § 27B or § 27C hearing was preponderance of evidence. *See* 1979 Md.Laws, ch. 701. That followed a conclusion by the U.S. District Court in *Dorsey v. Solomon, supra,* 435 F.Supp. 725, that no higher standard was constitutionally required.

Within a week or two after passage of the 1979 law (SB 870), however, the United States Supreme Court decided *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), in which it held that, in a *civil* commitment proceeding, the preponderance of the evidence standard was constitutionally inadequate; the State was obliged to justify involuntary civil confinement by clear and convincing evidence. Early interpretations of *Addington* suggested that the reasoning employed by the Supreme Court with respect to civil commitment might apply equally to the commitment of defendants ex-

In September, 1982, appellant unsuccessfully sought relief through a § 27C bi-level proceeding. Although the record in that proceeding is not now before us, it is implicit from appellant's lack of success that the court again determined upon clear and convincing evidence that, by reason of mental disorder, he would, if released from confinement, continue to be a danger to himself or to others.

Much of this procedure changed in 1984, with the enactment of 1984 Md.Laws, ch. 501. In the aftermath of the celebrated trial of John Hinckley, the Governor created a Task Force to Review the Defense of Insanity. Ch. 501 is largely the product of that Task Force.

Although the 1984 Act completely rewrote title 12 of the Health-General article (which, by virtue of Code Revision had supplanted former art. 59 in 1982), a great deal of the existing law was unchanged. The insanity defense was retained, as were the substantive tests or standards for competence to stand trial, criminal responsibility, and eligibility for release following an adjudication of insanity.

The major changes made by the new law seemed to flow from the intervening pronouncements of the U.S. Supreme Court in *Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). There, a closely divided Court

---

cused from criminal responsibility by reason of insanity. *See* Opinion of the Attorney General on SB 870 (5/25/79); Opinion of the U.S. Court of Appeals for the Fourth Circuit in *Dorsey v. Solomon,* 604 F.2d 271 (4th Cir.1979); this Court's opinion in *Williams v. Superintendent,* 43 Md.App. 588, 406 A.2d 1302, *cert. granted* 286 Md. 754 (1979), *judgment vacated in light of Legislative enactment* 288 Md. 523 (1980); and *Commitment Following An Insanity Acquittal,* 94 Harv.L.R. 605, 615–17 (1981). Accordingly, at its next session, by 1980 Md.Laws, ch. 292, the Legislature amended § 27B(i) to require the court's findings under § 27B(e) and (f) to be upon clear and convincing evidence. By virtue of the cross-reference to those sections in § 27C(d), the same increased standard was automatically made applicable to the post-commitment administrative proceeding under § 27C. The 1980 amendment did not affect either the *habeas corpus* proceeding under § 14 or the "judicial release" proceeding under § 15, however. Thus, if a committed defendant chose either of those remedies, he still had the burden of establishing his eligibility for release by a preponderance of evidence.

(5–4) found no constitutional deficiency in a District of Columbia law that (1) placed the burden on the defendant in the criminal proceeding to establish his insanity by a preponderance of the evidence, (2) provided for automatic commitment of the defendant to a mental hospital upon an adjudication of insanity until he could establish his entitlement to release, and (3) afforded him an opportunity within 50 days of commitment and at six-month intervals thereafter to establish in a judicial proceeding his entitlement to release, by a preponderance of the evidence.

Though reaffirming the determination in *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), that a "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," (*Jones, supra,* 463 U.S. at 361, 103 S.Ct. at 3048), the Court concluded that "a finding of not guilty by reason of insanity is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society." *Id.* at 366, 103 S.Ct. at 3050. Turning then to the question of who ought to bear the burden on the issue of commitment and by what standard, the Court expressly rejected an extension of the *Addington* holding to the commitment of "insanity acquittees," concluding that there were "important differences between the class of insanity acquittees that justify differing standards of proof." *Id.* at 367, 103 S.Ct. at 3051. The fact that the insanity acquittee *"himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness ... is good reason for diminished concern as to the risk of error." *Id.* (emphasis in original). Thus, "[t]he preponderance of the evidence standard comports with due process for commitment of insanity acquittees." *Id.* at 368, 103 S.Ct. at 3051 (footnote omitted).

In accordance with these holdings and upon the Task Force's recommendations, the Legislature did away with the existing commitment and release procedures and adopted in their stead much of the District of Columbia approach sustained in *Jones.* Under prior caselaw, as not-

ed, once the defendant, at his criminal trial, offered sufficient evidence of insanity to rebut the initial presumption of sanity, the State was required to prove sanity (*i.e.*, criminal responsibility) beyond a reasonable doubt. New § 12–109(b) changed that; it requires the defendant to prove non-responsibility by a preponderance of evidence.

A similar shift in burden of proof was made with respect to both the initial commitment proceeding and a subsequent bi-level proceeding for release. Under new § 12–111, a defendant found not criminally responsible is automatically committed to DHMH for institutional inpatient treatment; under § 12–113, he is eligible for release only if he would not be a danger to himself or to the person or property of others, and "[t]o be released, a committed individual has the burden to establish by a preponderance of the evidence eligibility for discharge or eligibility for conditional release."

Section 12–114 requires that, within 50 days after initial commitment, a hearing must be held before a DHMH hearing officer, "to consider any relevant information that will enable the hearing officer to make recommendations to the court as to whether the committed individual is eligible for release under § 12–113...." At the conclusion of the hearing, the hearing officer prepares and sends to the court a report containing (1) a summary of the evidence presented at the hearing, (2) "[r]ecommendations of the hearing officer as to whether the individual proved, by a preponderance of the evidence, eligibility for conditional release, or eligibility for discharge," and (3) if the hearing officer determines that the defendant "proved eligibility for conditional release," the recommended conditions of the release. *See* § 12–115.

As in the prior law, the court makes the actual decision. It may on its own initiative and must upon timely filed exceptions hold a hearing, but, with or without a further hearing, it must ultimately determine "whether the evidence indicates that the committed individual proved by a

preponderance of the evidence eligibility for release, with or without conditions, in accordance with § 12–113. . . ." *See* § 12–117(a).

Subsequent release following this initial determination is governed by § 12–118. At yearly intervals,[5] the defendant may seek release through either a bi-level proceeding similar to that conducted pursuant to §§ 12–114–12–117 or a direct judicial proceeding, where the issue of his eligibility for outright or conditional release can be tried before the judge or a jury. Whichever route is chosen, the judicial trier of fact ultimately must determine "whether the committed individual has proved eligibility for release by a preponderance of the evidence. . . ." *See* § 12–118(b)(2) and (c)(4).

Ch. 501 took effect July 1, 1984. In November, 1984, appellant requested another hearing before a DHMH hearing officer but urged that the proceeding—at least as to the standard and burden of proof—be governed by the former law. The State insisted, however, and on November 21, 1984, persuaded the Circuit Court for Baltimore City to direct, that the proceeding be conducted under the new law.

An evidentiary hearing was held before a hearing officer on March 21, 1985, at which only two people—appellant and Dr. Brian Crowley, a psychiatrist on the staff of C.T. Perkins State Hospital—testified. Appellant acknowledged that he currently had "a mental health problem" and that he was "sick." If released, he said he would go home to live with his mother, get a job, and accept outpatient treatment. Dr. Crowley, expressing the unanimous view of the C.T. Perkins staff conference, recommended retention. He opined that appellant continued to suffer from a mental disorder—schizophrenia, paranoid type—and that, if re-

---

**5.** Section 12–118(a)(2) permits an earlier application if the application is accompanied by an affidavit of a physician or licensed psychologist "that states an improvement in the mental condition of the committed individual since the last hearing." Except for the requirement that the affidavit be of a physician or psychologist, that provision was also in the earlier law. *See* former art. 59, § 27C(a).

leased, he would present a danger to himself or others. Dr. Crowley noted that appellant had "a long history of serious psychosis with paranoid features, with delusional symptoms and feelings of being persecuted." He stated further that appellant "still is very guarded and suspicious, has really no understanding of his mental disorder. And hence, I don't think he can be reasonably expected to be able to cooperate in an adequate treatment plan, if he were out on the street."

On March 29, the DHMH hearing officer filed a report in which he found that appellant "has failed to prove, by a preponderance of the evidence, eligibility for conditional release, or eligibility for discharge." He therefore recommended that appellant be retained at C.T. Perkins for inpatient care and treatment. Appellant excepted to the report, but the court, on June 4, 1985, concurred in the hearing officer's findings and ordered a continuation of appellant's confinement. We granted appellant's timely application for leave to appeal (*see* Health-Gen. art., § 12–118(d)(2)) to consider whether,

"I. The circuit court's order requiring appellant to establish his eligibility for release by a preponderance of the evidence subjected appellant to an ex post facto law in violation of the Maryland and U.S. Constitutions.

II. The court below erroneously construed Section 4 of Ch. [501] in giving retrospective effect to the burden of proof provision codified as § 12–113(d)."

We shall consider these issues in inverse order; finding no error, however, we shall affirm.

(1) *Statutory Construction*

Section 5 of ch. 501 provides that the Act "shall take effect on July 1, 1984." Section 4 states:

"That the provisions of this Act shall be applicable *to any case filed* on or after the effective date of this Act *and to any individual found not criminally responsible by reason of insanity* or determined to be incompetent to stand trial *who is under commitment to the Depart-*

*ment of Health and Mental Hygiene on or after the effective date of this Act;* except that the *initial* commitment of an individual found to have been insane at the time of the commission of a criminal act under the law in effect before the effective date of this Act shall be governed by former §§ 12–110 through and including 12–113 of the Health—General Article as those sections applied on June 30, 1984." (Emphasis added.)

 In the Circuit Court, appellant argued that because his "case" had been "filed" before July, 1984, and because the term "not criminally responsible by reason of insanity" originated in the Act itself and had no significance before July, 1984, § 4, by its very terms, precluded application of the Act to him. Except for a passing reference in his brief to memoranda of law that he filed in the Circuit Court, however, appellant does not pursue that argument before us, and we shall therefore not consider it.[6] His argument here is based on the "legal presumption" that "absent a clear expression of contrary legislative intent," an Act is intended to have only prospective effect; section 4, he says, does not clearly articulate such a contrary intent. We disagree.

Ch. 501, as noted, rewrote a good bit of the State insanity law and affects the entire spectrum of proceedings from the criminal trial through post-adjudication commitment and ultimate release from confinement. In using the language it did, the Legislature clearly manifested an intent to have those provisions affecting the trial apply only to cases filed on or after July 1, 1984, to have those provisions affecting *initial* commitment apply only to commitments made on or after that date, but to have those provisions governing release from confinement apply to all persons who were in

---

**6.** An argument not presented in the appellant's brief will not be considered on appeal. *Jacober v. High Hill Realty, Inc.,* 22 Md.App. 115, 321 A.2d 838, *cert. denied* 272 Md. 743 (1974); a mere reference to a trial memorandum does not suffice to present the argument. *Rosenberg v. Rosenberg,* 64 Md.App. 487, 523, n. 10, 497 A.2d 485 (1985).

fact "under commitment" on that day. There is no other sensible way to read § 4.

### (2) *Ex Post Facto Considerations*

The enactment of *ex post facto* legislation is prohibited by both the Federal and the Maryland Constitutions. Art. 1, § 10, cl. 1 of the Federal Constitution states unequivocally that "No State shall ... pass any ... ex post facto Law...." Art. 17 of the Md.Decl. of Rts., which antedated its Federal counterpart by 11 years, is a bit more verbose: "That retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made...." [7]

▮ Notwithstanding the difference in language, these provisions, as interpreted respectively by the U.S. Supreme Court and the Maryland Court of Appeals, are essentially the same in intent, scope, and effect. The Maryland provision "parallels the federal clause ... and the Supreme Court's interpretation of the federal *ex post facto* clause is persuasive authority" in construing the State counterpart. *Tichnell v. State,* 287 Md. 695, 736, 415 A.2d 830 (1980).

The seminal case interpreting the Federal provision was *Calder v. Bull,* 3 Dall. 386, 1 L.Ed. 648 (1798). At issue there was whether an Act of the Connecticut legislature that set aside a decree of a State probate court and granted a new hearing in that court constituted a prohibited *ex post facto* law. The Connecticut court had rejected the complaint of the parties aggrieved by the legislative act; the Supreme Court affirmed.

Three of the four Justices who sat in the case made clear in their separate Opinions that the prohibition did not ex-

---

7. Art. 17 goes on to prohibit "any retrospective oath or restriction" from being "imposed" or "required." Appellant does not argue that the challenged part of ch. 501 represents a "retrospective oath or restriction," and so we shall not give further consideration to that aspect of Art. 17.

tend to all retrospective legislation, but only that of a penal nature. Justice Paterson opined that *"ex post facto* laws have an appropriate signification; they extend to penal statutes, and no further; they are restricted in legal estimation to the creation, and, perhaps, enhancement of crimes, pains and penalties." 3 Dall. at 397. Justice Chase, in a more frequently quoted passage, put it this way (at 390):

"I will state what laws I consider *ex post facto* laws, within the words and intent of the prohibition. 1st. Every law that makes an action done before the passing of the law; and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender."

In the nearly 200 years since *Calder v. Bull,* the Supreme Court has never departed from that basic analysis and circumscription of the prohibition. As late as 1981, in *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the Court regarded an *ex post facto* analysis as "concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred...." *Id.,* 30, n. 13, 101 S.Ct. at 965, n. 13. *See also Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977), quoting from *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925). The same type of analysis and circumscription has found expression in the Maryland cases construing Art. 17. *See Spielman v. State,* 298 Md. 602, 608, 471 A.2d 730 (1984); *Village Books, Inc. v. State,* 22 Md.App. 274, 287, 323 A.2d 698 *cert. denied* 273 Md. 723 (1974); *cf. Beard v. State,* 74 Md. 130, 132, 21 A. 700 (1891); *Elliott v. Elliott,* 38 Md. 357, 360 (1873); *An-*

*derson v. Baker*, 23 Md. 531, 566 (Bartol, J., dissenting), 581, 582 (Cochran, J., concurring), and 605 (Weisel, J., concurring) (1865); *Braverman v. Bar Ass'n of Balto.*, 209 Md. 328, 348, 121 A.2d 473, *cert. denied* 352 U.S. 830, 77 S.Ct. 44, 1 L.Ed.2d 51 (1956).

The threshold question, then—and the dispositive one, in our view—is whether the challenged act, shifting the burden of proof in a bi-level post-commitment release proceeding, "assigns more disadvantageous *criminal or penal consequences*" to appellant's "criminal" act than were assigned to it when the act was committed. *Weaver v. Graham, supra,* 450 U.S. 24, 30, n. 13, 101 S.Ct. 960, 965, n. 13, 67 L.Ed.2d 17 (emphasis added).

The question of whether, and when, a sanction or disability imposed by statute is penal in nature was addressed in *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). At issue there was whether Congress could constitutionally deprive a native-born American of his United States citizenship, and thereby render him stateless, because of his conviction by court-martial of wartime desertion. The Act—§ 401(g) of the Nationality Act of 1940—was challenged as being both *ultra vires* and as imposing cruel and unusual punishment; it was in the latter context that the Court considered whether the deprivation of citizenship was penal in nature. Speaking for himself and Justices Black, Douglas, and Whittaker, Chief Justice Warren borrowed from the *ex post facto* cases in enunciating the standards for deciding that issue. At 95–96, 78 S.Ct. at 595–596:

"This Court has been called upon to decide whether or not various statutes were penal ever since 1798. *Calder v. Bull,* 3 Dall. 386 [1 L.Ed. 648 (1798)]. Each time a statute has been challenged as being in conflict with the constitutional prohibitions against bills of attainder and *ex post facto* laws, it has been necessary to determine whether a penal law was involved, because these provisions apply only to statutes imposing penalties. In deciding whether or not a law is penal, this Court has general-

ly based its determination upon the purpose of the statute. *If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.* The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature." [8] (Footnotes omitted; emphasis added.)

Some further expression of these views was given five years later in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), which involved another section of the Nationality Act of 1940, purporting to strip Americans of their citizenship automatically for leaving the country in time of war in order to avoid military service. Again, the question was raised of whether the sanction—expatriation—was penal in nature. Justice Goldberg, writing for the Court, noted in *dicta* that, absent "conclusive evidence of congressional intent as to the penal nature of a statute," the following factors, which he acknowledged "often point in differing directions," were relevant to the inquiry: [9]

---

**8.** The ultimate conclusion reached by the Chief Justice on this analysis was that the Act *was* penal in nature and that it *did* constitute cruel and unusual punishment. Justice Brennan concurred in the judgment on the independent ground that the Act was *ultra vires*. Justices Frankfurter, Burton, Clark, and Harlan dissented on the grounds that the Act was not *ultra vires*, that it was not penal in nature but rather was consistent with a " 'non-penal' purpose to regulate the military forces," and that, even if penal in nature, it did not impose cruel or unusual punishment. *See also Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958).

**9.** These observations were *dicta* because the Court went on to hold that "objective manifestations of congressional purpose indicate conclusively that the provisions in question can only be interpreted as punitive." *Id.* at 169, 83 S.Ct. at 568.

"Whether the sanction involves an affirmative disability or restraint, whether it has, historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned...."

*Id.* at 168–69, 83 S.Ct. at 567–68 (footnotes omitted).

Justice Stewart, joined by Justice White, in dissent put it more succinctly: "The question of whether or not a statute is punitive ultimately depends upon whether the disability it imposes is for the purpose of vengeance or deterrence, or whether the disability is but an incident to some broader regulatory objective." *Id.* at 208, 83 S.Ct. at 588.

It would be a most unproductive enterprise for us to attempt to pick and choose among these various expressions in order to discern any single authoritative articulation of the proper standard. In essence, they express the same thought: What was the paramount legislative intent; what is its paramount effect? If retributive or deterrent, it is most likely punitive or penal in nature; if it is to accomplish "some other legitimate governmental purpose," it is likely not punitive or penal, despite the incidental imposition of some disability.

Appellant's analysis is fairly straightforward. Under *Addington v. Texas*, he says, the State must bear the burden of justifying a civil commitment by clear and convincing evidence. *Jones v. United States* permits a different rule for "insanity acquittees," he continues, only because of the judgment rendered in the criminal proceeding. *Ergo*, the commitment of an "insanity acquittee" arising from a criminal proceeding is necessarily criminal or punitive in nature, and shifting the burden and standard from

that required by *Addington* to that permitted by *Jones* is also necessarily punitive in nature.[10]

Although we do not concur in the ultimate validity of this proffered syllogism, and indeed note that *Jones* itself refutes the argument, appellant is at least correct in analyzing the challenged provision in context. Standards or bur-

---

**10.** At oral argument, appellant posited an additional theory in support of his claim, one that does not appear to have been raised below or, indeed, in his brief. He noted that, under Md.Code Ann. art. 27, § 139, elopement from confinement by an "insanity acquittee" constitutes criminal escape—a felony—whereas elopement by a person civilly committed does not constitute a crime. This, he says, is further evidence of the punitive nature of his commitment.

Punishment for elopement from confinement does not necessarily make the confinement itself penal or punitive in nature, any more than punishment for desertion makes service in the armed forces penal or punitive. Since 1969, elopement by a person *civilly* committed to a drug addiction rehabilitation center under the Comprehensive Drug Abuse Control Act has been declared criminal under § 139. *See* former Md.Code Ann. art. 43B, § 17, which was transferred to § 139 in 1982 as part of the enactment of the Health-General article (1982 Md.Laws, ch. 21). Inclusion within § 139 of elopement by an "insanity acquittee" was effected in 1984 by ch. 501, which, we note, also expressly added to § 139 elopement by persons committed to DHMH following a finding of incompetence to stand trial. *Compare Slagle v. State,* 243 Md. 435, 221 A.2d 641 (1966), holding that elopement by a person transferred under the former "insanity" law to C.T. Perkins State Hospital for evaluation as to his competence to stand trial constituted criminal escape under § 139.

Persons civilly committed to DHMH can be released administratively by DHMH; indeed, absent the periodic execution of new certificates of the type required for an initial involuntary admission, such persons *must* be released administratively. *See* Md.Code Ann., Health-Gen. art., § 10–806. "Insanity acquittees," on the other hand, cannot be released, either conditionally or outright, administratively; only the court can order their release. Unlike persons civilly committed, whose "dangerousness" is often a matter merely of prediction, "insanity acquittees" have demonstrated a level of dangerousness by their past criminal behavior; indeed, it is that past demonstration, coupled with a current diagnosis, that particularly justifies an enforced treatment. *Jones v. United States, supra.* Elopement from that enforced treatment therefore carries with it more than the ordinary problems that may arise from an elopement by a civilly committed patient; it serves to frustrate the court's legislatively authorized control over the individual and provides a more significant potential threat to public safety. Those are the considerations that justify reinforcing the therapeutic commitment by punishing elopement.

dens of proof, of themselves, are neither penal nor non-penal. They take their character as one or the other only from the nature of the proceeding to which they relate. The real issue, then, is whether the confinement of "insanity acquittees" under Maryland law and against the standards enunciated by the Supreme Court, is penal or punitive in nature.

In *Langworthy v. State,* 284 Md. 588, 399 A.2d 578 (1979), a unanimous Court of Appeals made clear its view that the purpose and effect of such confinement was *not* punitive. It said, at 598, 399 A.2d 578:

"In short, the clear legislative intent regarding the successful interposition of a plea of insanity is not that an accused is to be found not guilty of the criminal act it was proved he committed, *but that he shall not be punished therefor. Rather than be punished, he may go free or, under prescribed circumstances, be provided treatment for his mental disorder.*" (Emphasis added.)

*See also Pouncey v. State,* 297 Md. 264, 267–68, 465 A.2d 475 (1983); *Johnson v. State,* 292 Md. 405, 448, 439 A.2d 542 (Eldridge, J., dissenting), and 474 (Cole, J., dissenting) (1982).

The Supreme Court expressed the same view in *Jones v. United States, supra,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694. At 368, 103 S.Ct. at 3051, it observed: "The purpose of commitment following an insanity acquittal, like that of civil commitment, *is to treat the individual's mental illness* and protect *him* and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." (Emphasis added.) *See also O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

These expressions are in full keeping with the plain words of the Legislature. In former art. 59, §§ 27, 27B, and 27C, the General Assembly carefully and consistently made clear that post-adjudication confinement was solely for "in-patient care or treatment," and that same limitation

appears in the current law. *See* Health-Gen. art., §§ 12–111(a), 12–113(b). Indeed, the law requires that, once the individual's condition has improved to the point that institutional confinement is no longer necessary, he must be released from that confinement, either with or without condition. *See* former art. 59, § 27B(f), (h); current Health-Gen. art., § 12–113(b), (c).

■ Thus, while, as appellant contends, institutional confinement is certainly a consequence of his criminal act (*see Pouncey v. State, supra,* 297 Md. at 270, 465 A.2d 475), it is not a penal or punitive consequence. *Cf. Monroe v. Director,* 230 Md. 650, 653, 187 A.2d 873 (1963). Accordingly, the shifting of the burden and standard of proof in the bi-level release proceeding does not constitute a prohibited *ex post facto* law under either the Federal or the Maryland Constitution.[11]

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

---

**11.** In reaching this conclusion, we have considered *State v. Ballou,* 125 N.H. 304, 481 A.2d 260 (1984), which we find distinguishable on a number of grounds, not the least of which is the fact that the New Hampshire constitutional provision applied in that case prohibits all retrospective legislation, civil and criminal, and is therefore much broader than either the Federal or the Maryland counterparts.