966 A.2d 982

**Sherwood BYERS, Jr.**

v.

**STATE of Maryland.**

**No. 2824, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

March 6, 2009.

David P. Kennedy (Nancy S. Forster, Public Defender on the brief), Baltimore, for Appellant.

Brenda Gruss (Douglas F. Gansler, Atty. General on the brief), Baltimore, for Appellee.

Panel: KRAUSER, C.J., HOLLANDER, CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge, retired, specially assigned.

This case is a classic appellate court's nightmare, except that it does not fade at the break of day. It is as if we were called upon to apply the official Major League Baseball Rulebook to a spirited and hard fought neighborhood game of three-at-the-bat. It was a contest with competent adversaries performing skillfully on the field, except for an incorrigible tendency to make up many of the rules as they went along. The appeal is further complicated by the questionable extent to which we may take notice, *nostra sponte*, of breaches of the rules when neither party noticed the breaches and where neither, therefore, lodged objections.

It behooves us, of course, to look first at the rulebook. The rulebook is Maryland Code, *Criminal Procedure Article*, Title 3, "Incompetency and Criminal Responsibility in Criminal Cases." Sections 3–109 through 3–113 spell out how one who has committed a crime but is not criminally responsible gets committed to the Department of Health and Mental Hygiene ("the Department") in the first place. Sections 3–114 through 3–123 then spell out how, if ever, one gets out. The statutory

"rulebook" itself, unfortunately, is not totally free of ambiguity. Particularly vexing is that it is not always clear whether the assigned role of the judge is simply that of refereeing the play of the administrative agency or is one involving the actual participation of the judge in the game itself.

### The Initial Commitment

For the appellant, Sherwood Byers, Jr., how he got in to the custody of the Department poses no present problem. He was originally convicted in the Circuit Court for Prince George's County on January 30, 2007, for first-degree assault in a court trial on an agreed statement of facts. On February 27, 2007, however, the original trial judge further found that the appellant had not been criminally responsible at the time of the crime. *See Treece v. State,* 313 Md. 665, 547 A.2d 1054 (1988). Accordingly, the appellant was committed to the Department pursuant to §§ 3–109 and 3–112. *See Pouncey v. State,* 297 Md. 264, 266–69, 465 A.2d 475 (1983). Section 3–109(a) provides:

(a) *In general.*—A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:

(1) appreciate the criminality of that conduct; or

(2) conform that conduct to the requirements of law.

Section 3–112(a) provides:

(a) *In general.*—Except as provided in subsection (c) of this section, after a verdict of not criminally responsible, the court immediately shall commit the defendant to the Health Department for institutional inpatient care or treatment.

Untroubled by any foolish consistency, the appellant, once in, wanted out. What is literally before us on this appeal is the December 19, 2007, decision by the original trial judge to deny the recommendation of the Department that the appellant be discharged unconditionally. The resolution of the appellant's appeal from that denial requires a painstaking examination of the statutorily mandated procedures governing

the release of a person previously committed to the Department.

## A First Application or a Later One?

As we undertake that examination, two problems loom on our appellate horizon. There is first the problem of whether the denial of discharge now being challenged was 1) a denial of the first application for release or discharge or 2) a denial of a subsequent application. It makes a big difference. Rules 3–114 through 3–118 prescribe the procedures for handling the initial application for release or discharge. Section 3–119, by sharp contrast, prescribes a distinct procedure for handling a subsequent application by the committed inmate. Section 3–120 prescribes a procedure for handling a subsequent application by the Department. Perplexingly, the case before us tended to blur that distinction in sequencing, or, worse perhaps, failed to take cognizance of the fact that the distinction even existed.

## A Judicial Decision or an Administrative One?

The second problem that looms, ominously, on our horizon goes to the very heart of what our appellate review should consist of. Are we, on the one hand, reviewing an essentially *de novo* judicial decision by the circuit court? If so, there is a distinct set of rules of review that must be employed. Should that be the case, moreover, we are probably looking at an affirmance. Or are we, on the other hand, reviewing the circuit court's handling of something in the nature of, even if not purely, an administrative appeal? Should that be the case, a very different set of rules of review comes into play. Should that be the case, moreover, we are probably looking at a reversal. The litigants before us randomly wander back and forth across the line, however, sometimes invoking one set of rules and sometimes the other.

Right and wrong are not moral absolutes. A decision may readily be either right or wrong depending on which set of rules we bring to bear on it. Whether a judge is right or wrong, of course, all depends on what the judge is being asked

to do. Under Modality A, a typical review of an earlier administrative decision, the reviewing judge might well say, "I acknowledge that there was substantial evidence (although I personally wouldn't believe it for a minute) to have permitted the agency legitimately to decide as it did. Therefore, I must, unhappily, affirm." By contrast, under Modality B, a *de novo* decision on the ultimate merits, the same judge on precisely the same evidence might well say, "Although there was substantial evidence that could legitimately have persuaded the agency to do what it did, it doesn't persuade me. Therefore, I, happily, reverse." Where the judge comes out on the issue is a function of where the judge goes in.

What must be determined in this case is not the abstract rightness of what the trial judge decided, but the very nature of the decision she was authorized to make. The hypothetical problem we pose in this case is very real. If, on the ultimate merits of whether this appellant "would not be a danger," the judge in this case had been authorized to make that determination for herself, the judge would not have been in error in denying release or discharge and should be affirmed. If, on the other hand, the judge was required to decide the very different question of whether there was substantial evidence to have permitted the ALJ and the Board to reach the diametrically opposite conclusion, the judge's decision would be in error and would have to be reversed. What is critical is not the ultimate decision as an abstraction, but the type of decision being made. Even an impeccably correct decision that one is not authorized to make can be a case of being in the right pew but the wrong church.

One final preliminary note: It is necessary that we undertake a close examination of all of Title 3 in its entirety because, on the critical question of whether the trial judge was authorized to make the final decision on the merits of the appellant's discharge, there are in Title 3, to be sure, one or two oblique indications that the answer to that question is, "Yes." Those indications, however, are outnumbered by a dozen other oblique indications that the answer is, "No." To get an accurate count of the oblique affirmative indications

versus the oblique negative indications, we need to look at the statutory scheme in its totality.

### The Statutory Scheme

■ The procedures by which one who has been committed to the custody of the Department of Health and Mental Hygiene may subsequently be released or discharged from that custody are all creatures of statute. As we undertake a review of that statutory scheme, we must bear in mind that, although the caption of a case such as this would seem to indicate that it is a criminal case, a proceeding to release or discharge a person committed to the Department because of a finding of not criminally responsible is a civil proceeding. *Harvey v. State*, 51 Md.App. 113, 114 n. 1, 441 A.2d 1094, *cert. denied*, 293 Md. 616 (1982).

The overall statutory plan calls for release or discharge to be a hybrid determination engaging both the executive branch and the judicial branch in the decisional process. Both the Department of Health and Mental Hygiene and the Office of Administrative Hearings act on behalf of the executive branch. The circuit court acts for the judicial branch. Ideally, the statute should set out with precision the relationship and the rules for interaction between the two branches. The statute, however, does not always turn square corners.

Title 3 maps out two different routes to release or discharge, one for the first-time application and another for subsequent applications by the committed person himself. There is some overlap but there are significant differences. Sections 3–114 through 3–118 control the handling of a first application, as well as subsequent applications filed by the Department pursuant to § 3–120. Section 3–119 controls the handling of all subsequent applications by the committed person. An appreciation of the whole statutory scheme is important because each of the modalities sheds significant light on the other. Section 3–119, for instance, provides two different forums for adjudicating the release or discharge. Subsection (b) provides an "Administrative procedure." Subsection (c) provides a "Court procedure." Subsection (a)

further provides that "a committed person may apply for release under *either subsection (b) or (c)* of this section, *but not both.*" (Emphasis supplied).

Section 3–119(b)(2), moreover, fleshes out the short-hand reference to "Administrative procedure" by applying to it the fuller provisions already spelled out for first-time applications by §§ 3–114 through 3–118. Reciprocally, any possible doubt about the essentially administrative character of §§ 3–114 through 3–119, arguably uncertain if those sections were looked at in a vacuum, is quickly dissipated by § 3–119(b)'s characterization of the whole § 3–114 through § 3–118 package as an "Administrative procedure."

### Release or Discharge Generally

Section 3–114 governs release generally and is applicable to first-time applications and subsequent applications alike. Subsection (a) points out that the procedures that must be followed are spelled out in §§ 3–115 through 3–122.

(a) *In general.*—A committed person may be released under the provisions of this section and §§ 3–115 through 3–122 of this title.

Subsection 3–114(b) sets out the controlling criterion for an unconditional discharge.

(b) *Discharge.*—A committed person is eligible for discharge from commitment only *if that person would not be a danger,* as a result of mental disorder or mental retardation, *to self or to the person or property of others if discharged.*

(Emphasis supplied). Subsection 3–114(c) parallels subsection (b) except that it recognizes the possibility of conditions being imposed on a release by the court.

(c) *Conditional release.*—A committed person is eligible for conditional release from commitment only *if that person would not be a danger,* as a result of mental disorder or mental retardation, *to self or to the person or property of*

*others* if released from confinement with conditions imposed by the court.

(Emphasis supplied).

Subsection (d) then establishes that the burden of proof to establish eligibility for discharge or conditional release is allocated to the person seeking such release. It places on the "committed person," as the proponent of the motion, the ordinary civil burden of persuasion.

(d) *Burden of proof.*—To be released, *a committed person has the burden* to establish *by a preponderance of the evidence* eligibility for discharge or eligibility for conditional release.

(Emphasis supplied). Realistically, subsection (d) treats the committed person as the proponent even if the application for release has been brought by the Department.

Subsections 3–115 through 3–122 then spell out the procedures by which a discharge or conditional release is to be adjudicated. Prior to their recodification as part of the Criminal Procedure Article, through ch. 10 of the Acts of 2001, these provisions were found in the Health–General Article as §§ 12–114 through 12–121. The revisor's notes to the recodification point out that the changes, if any, were only of style and not of substance. These procedural provisions, in their earlier manifestation, were first made a part of Maryland law when ch. 501 of the Acts of 1984 completely revised Maryland's insanity laws. In *Anderson v. Department of Health and Mental Hygiene,* 64 Md.App. 674, 681, 498 A.2d 679 (1985), reversed on other grounds, 310 Md. 217, 528 A.2d 904 (1987), Judge Wilner noted the significance of the 1984 Act.

Much of this procedure changed in 1984, with the enactment of 1984 Md. Laws, ch. 501. In the aftermath of the celebrated trial of John Hinckley, the Governor created a Task Force to Review the Defense of Insanity. Ch. 501 is largely the product of that Task Force.

Although *the 1984 Act completely rewrote title 12 of the Health–General article* (which, by virtue of Code Revision had supplanted former art. 59 in 1982), a great deal of the

existing law was unchanged. The insanity defense was *retained,* as *were* the substantive tests or standards of competence to stand trial, criminal responsibility, and *eligibility for release following an adjudication of insanity.* (Emphasis supplied).

In its *Anderson v. Department,* 310 Md. at 221–22, 528 A.2d 904, the Court of Appeals, through Judge Eldridge, also reviewed these procedural provisions.

Ch. 501 of the Acts of 1984 abolished the rule that in the criminal trial the State had the burden of establishing the defendant's sanity. Section 12–109 of the Health–General Article (1986 Cum.Supp.) now provides:

"(b) *Burden of proof.*—The defendant has the burden to establish by a preponderance of the evidence, the defense of not criminally responsible."

Chapter 501 also eliminated the initial commitment examination and hearing procedures; instead it contained an automatic commitment requirement. *Section 12–111(a) [now CP, § 3–112(a) ] provides that "after a verdict of not criminally responsible, the court immediately shall commit the defendant to the Department for institutional, inpatient care or treatment."* This automatic commitment continues indefinitely *until the criminal defendant prevails at an administrative proceeding or a judicial release hearing* or obtains a writ of habeas corpus.

*Lastly, Ch. 501 abolished the requirement that, in an administrative release hearing, the State has the burden of proving the necessity for the criminal defendant's continued commitment. Section 12–113(d) now places the burden of proof on the defendant to show by a preponderance of the evidence that he no longer meets the standards for commitment.* Thus, *under the new statute, the criminal defendant must prove his eligibility for release whether in a judicial proceeding or an administrative proceeding.*

(Emphasis supplied).

In his *Anderson* opinion, Judge Wilner also examined the now prevailing procedures for discharge or conditional release.

*A similar shift in burden of proof was made with respect to* both the initial commitment proceeding and *a subsequent bi-level proceeding for release.* Under new § 12–111, a defendant found not criminally responsible is automatically committed to DHMH for institutional inpatient treatment; *under § 12–113 [CP, § 3–114], he is eligible for release only if he would not be a danger to himself or to the person or property of others,* and "[t]o be released, *a committed individual has the burden to establish by a preponderance of the evidence eligibility for discharge or eligibility for conditional release.*"

Section 12–114 [CP, § 3–115] requires that, within 50 days after initial commitment, *a hearing must be held before a DHMH hearing officer,* "to consider any relevant information that will *enable the hearing officer to make recommendations to the court as to whether the committed individual is eligible for release* under § 12–113. . . ." At the conclusion of the hearing, the *hearing officer prepares and sends to the court a report containing (1) a summary of the evidence* presented at the hearing, (2) *"[r]ecommendations of the hearing officer as to whether the individual proved, by a preponderance of the evidence, eligibility for conditional release, or eligibility for discharge,"* and (3) if the hearing officer determines that the defendant "proved eligibility for conditional release," the recommended conditions of the release. *See* § 12–115.

64 Md.App. at 683, 498 A.2d 679 (emphasis supplied).

### Prompt Consideration of Possible Release

It is § 3–115 that automatically provides for a prompt release hearing to be conducted by the Office of Administrative Hearings. That is a hearing conducted within the confines of the Executive Branch of government by an Administrative Law Judge ("ALJ"). Subsection (a) provides that the function of the ALJ is "to make recommendations to the court" with respect to eligibility for release.

(a) *When required.*—Within 50 days after commitment to the Health Department under § 3–112 of this title, *a hear-*

*ing officer* of the Health Department *shall hold a hearing to consider any relevant information that will enable the hearing officer to make recommendations to the court* as to whether the committed person is eligible for release under § 3–114 of this title.

(Emphasis supplied).

Subsection (b) provides that the initial release hearing before the ALJ may be postponed 1) "for good cause" or 2) by the "agreement of the committed person and the Health Department." The initial hearing may, moreover, be waived by the committed person. Absent an affirmative waiver, however, a hearing will automatically be scheduled. The 50–day time limit for the hearing is, subject only to subsection (b), mandatory. Cf. *Harvey v. State,* 51 Md.App. 113, 441 A.2d 1094, *cert. denied,* 293 Md. 616 (1982). This is not the case with respect to subsequent applications for release or discharge by a committed person. Even if the initial hearing is waived, subsection (c) directs that the Department shall complete an examination and shall prepare an evaluation report, a copy of which shall be sent to 1) the committed person, 2) counsel for the committed person, 3) the State's Attorney, and 4) the Office of Administrative Hearings.

Subsection (e) then sets out the requirements for the conduct of the hearing before the ALJ.

(e) *Conduct of hearing.*—(1) *Formal rules of evidence do not apply to the release hearing,* and the office may admit and consider any relevant evidence.

(2) *The hearing shall be recorded, but the recording need not be transcribed unless requested.* The requesting party shall pay the costs of the transcript and, if exceptions have been filed, provide copies to other parties and the court. If the court orders a transcript, the court shall pay the costs of the transcript.

(3) Any record that relates to evaluation or treatment of the committed person by this State shall be made available, on request, to the committed person or counsel for the committed person.

(4) The Health Department shall present the evaluation report on the committed person and any other relevant evidence.

(5) *At the release hearing, the committed person is entitled:*

(i) to be present, to offer evidence, and to cross-examine adverse witnesses; and

(ii) *to be represented by counsel,* including, if the committed person is indigent, the Public Defender or a designee of the Public Defender.

(6) At the release hearing, the State's Attorney and the Health Department are entitled to be present, to offer evidence, and to cross-examine witnesses.

(Emphasis supplied). It is what happens after the § 3–115 administrative hearing that creates the current problem.

## An Executive–Judicial Hybrid

█ As we have pointed out, the administrative determination within the ranks of the executive branch that the committed person satisfies the criteria for release or discharge, even without any request for judicial review, is not self-executing. A judge must "sign off" on the release or discharge. A judge, after all, "committed" the person. Only a judge, therefore, may "uncommit" the person. The problem before us in this case is to decide whether that "signing off" on the release decision by the judge 1) contemplates only a monitoring by the judge of the operation of the adjudicative machinery before the agency or 2) whether it contemplates an actual decision by the judge on the ultimate merits of the release.

Sections 3–116, 3–117, and 3–118 in combination reveal an adjudicative procedure that is a curious executive branch-judicial branch hybrid. Although it will be our ultimate conclusion that the handling of the first application for release or discharge is unquestionably an "administrative procedure," what is now before us is far from a pure administrative appeal. In administrative law, if no petition for judicial review is taken by one of the parties, the administrative decision takes effect

and is a final resolution of the problem. In those cases where court intervention is requested, moreover, the judicial review is unquestionably deferential to the decision of the executive branch under scrutiny. That, however, is not necessarily the case before us. The preliminary decision of the ALJ or of the Department in this case is not even presumptively self-executing. Those earlier actions within the executive branch are but antecedents to the final action which is for the court alone. After the ALJ has conducted a hearing, § 3–116 mandates that a report shall be prepared for forwarding to the court for its ultimate action. Unless and until the court acts, nothing is done.

(a) *In general.*—Within 10 days after the hearing ends, *the Office shall prepare a report of recommendations to the court that contains:*

(1) a summary of the evidence presented at the hearing;

(2) *recommendations of the Office* as to whether the committed person proved, by a preponderance of the evidence, eligibility for conditional release or eligibility for discharge; and

(3) if the Office determines that the committed person proved eligibility for conditional release, the recommended conditions of the release in accordance with subsection (b) of this section.

(b) *Consideration of conditions for release.*—In recommending the conditions of a conditional release, the Office shall give consideration to any specific conditions recommended by the facility of the Health Department that has charge of the committed person, the committed person, or counsel for the committed person.

(c) *Copies of report.*—The Office shall send copies of the report of recommendations:

(1) to the committed person;

(2) to counsel for the committed person;

(3) to the State's Attorney;

(4) to the court; and

(5) to the facility of the Health Department that has charge of the committed person.

(d) *Exceptions.—The committed person, the State's Attorney, or the Health Department may file exceptions to the report of the Office* within 10 days after receiving the report.

(Emphasis supplied).

Because the ALJ and the Department do not even make a presumptively final decision but only "prepare a report of recommendations to the court," it might at first glance appear that the court is simply utilizing the adjudicative machinery of the executive branch, to wit, the Office of Administrative Hearings, just as the court regularly utilizes adjunct adjudicative machinery within its own branch of government, to wit, preliminary fact-finding and recommendations by masters in chancery. In the latter case, the court is obliged ultimately to make its own independent decision and may, should it choose to do so, receive evidence, hear witnesses, and engage in its own *de novo* fact-finding.

Section 3–117 makes it very clear, however, that the court possesses no such wide-ranging prerogatives when acting upon the recommendations of the ALJ. Section 3–117 provides that upon the court's receiving the report of recommendations from the ALJ, the court may hold a hearing. A significant limitation, however, is that the hearing shall be "on the record that was made before the Office." Section 3–117, moreover, does not authorize the taking of evidence by the court itself. If the court needs more evidence, it must remand the case to the ALJ for that purpose.

(a) *In general.*—Within 30 days *after the court receives the report* of recommendations from the Office:

(1) *the court on its own initiative may hold a hearing;* or

(2) *if timely exceptions are filed, or if the court requires more information, the court shall hold a hearing* unless the committed person and the State's Attorney waive the hearing.

(b) *Conduct of hearing.*—(1) *The court shall hold the hearing on the record that was made before the Office.*

(2) At the judicial hearing, the committed person is entitled to be present and to be represented by counsel.

(3) *The court may continue its hearing and remand for the Office to take additional evidence.*

(Emphasis supplied).

Although ordinarily a judicial hearing might contemplate the possibility of taking evidence, such is not always or necessarily the case. There could well be a hearing for the more limited purpose of allowing counsel, in the presence of the parties, to clarify issues and to argue the law. Such non-evidentiary hearings are frequently conducted on a motion to dismiss a pleading, a motion for summary judgment, or a variety of post-trial motions.

As we examine the complete statutory scheme, subsection 3–117(b), prescribing he conduct of the possible hearing before the judge, is a strong indication that the basic release or discharge determination is intended to be an administrative decision to be made within the executive branch of government, subject only to judicial monitoring of its procedural propriety, and is not intended to be something that segues into an actual judicial determination on the ultimate merits. Subsection (b)(1), of course, mandates that the court hearing shall be "on the record that was made before the Office." Most significantly, subsection (b)(3) then goes on to prescribe the steps that need to be taken in case further evidence should be needed.

If the Legislature contemplated that the ultimate decision on the factual merits was to be made by the judge, both the more sensible and the more efficient procedure would be for the additional evidence to be presented before the court. The judge would then be in the position to ask the clarifying and/or probing questions necessary to persuade the judge on the ultimate merits. The judge would be in the position to assess the credibility of the witnesses and to decide the relative weight to be given to the expert opinions of psychiatrists and

psychologists. To permit the court, should it wish to do so, to conduct its own further evidentiary hearing would clearly be both faster and more efficient than to remand the case back to the Office of Administrative Hearings, to wait for an additional administrative hearing to be scheduled and held without the benefit of "the formal rules of evidence," to wait for the ALJ to prepare a summary of the evidence and perhaps supplementary recommendations, and to have the entire package then returned to the court.

The entire release or discharge procedural package, it must be remembered, is a creature of statute, and only those things may be done that are authorized by the controlling statute. The circuit court is not in such a case exercising inherent common law powers. The statute in this regard does not provide for the taking of evidence or for any fact-finding to be engaged in by the court. The reason for this seems clear. If further evidence is required, that further evidence is not for the benefit of the court and is, therefore, not presented to the court. It is for the benefit of the ALJ and is, therefore, presented to the ALJ. The judge's role is only to determine, as a matter of law, whether the evidence before the ALJ was substantial enough to support the recommendation of the ALJ. This evidence-taking remand procedure, one that would otherwise be bizarre, buttresses our conclusion that, subject only to one situation yet to be discussed pursuant to § 3–119(c), the role of the judge in this entire statutory scheme is that of providing a mandatory judicial review of this particular variety of administrative decision (in this case, a recommendation) and not that of making a judicial decision on the ultimate merits. It remains a classic administrative appeal.

The penultimate piece in the statutory puzzle is § 3–118, spelling out what the judge must do after 1) receiving the recommendation from the Office and 2) holding a hearing unless the hearing is waived. In terms of the nature of the judge's decisional responsibility, the statutory language is by no means free of ambiguity. In pertinent part for our present analysis, § 3–118 provides:

(a) *In general.*—Within 15 days after a judicial hearing ends or is waived, *the court shall determine whether the evidence indicates* that the committed person proved *by a preponderance of the evidence eligibility for release,* with or without conditions, in accordance with § 3–114 of this title, and enter an appropriate order containing a concise statement of the findings of the court, the reasons for those findings, and ordering:

(1) continued commitment;

(2) conditional release; or

(3) discharge from commitment.

(b) *Order without hearing.*—(1) *If* timely exceptions are not filed, and, *on review of the report of recommendations from the Office, the court determines that the recommendations are supported by the evidence* and a judicial hearing is not necessary, *the court shall enter an order in accordance with the recommendations* within 30 days after receiving the report from the Office.

(2) *A court may not enter an order that is not in accordance with the recommendations from the Office unless the court holds a hearing* or the hearing is waived.

. . . .

(e) *Appeals.*—(1) An appeal from a District Court order shall be on the record in the circuit court.

(2) An appeal from a circuit court order shall be by application for leave to appeal to the Court of Special Appeals.

(Emphasis supplied).

Section 3–118(a) is perplexingly vague not only about what the judge is supposed to do but even vaguer about how the judge is supposed to do it. After stating the 15–day time limit within which the judge, after a hearing, must make a decision, the statute directs the judge to determine whether "the evidence indicates that *the committed person proved* by a preponderance of the evidence eligibility for release." (Emphasis supplied). "Proved" to whom? To the ALJ? Or to the reviewing judge? That language, even if unartfully expressed,

might be taken arguably to mandate an inquiry into whether the committed person had met his burden of production at the earlier hearing before the ALJ by offering some substantial evidence in support of the ALJ's finding. The reference, however, to "a preponderance of the evidence" is the classic language of persuasion.

That language, standing alone, would seem to indicate that it is the judge who must be personally persuaded that release or discharge is called for rather than an indication that the judge must only be satisfied, as a matter of law, that the evidence was sufficient for the ALJ to have been so persuaded. Such a reading, however, would be a significant departure from conventional or routine judicial review of an administrative decision, wherein the judge is concerned only with the burden of production before the agency and not with the burden of persuasion before himself.

At the most fundamental level, it is unclear whether the statute implies that the judge must be persuaded "by a preponderance of the evidence," or must simply decide, as a matter of law, whether the evidence before the ALJ was "substantial" enough to have permitted the ALJ to have been persuaded "by a preponderance of the evidence?" If it were the judge who had personally to be persuaded, what would the evidence be that might persuade the judge? The judge would have heard no witnesses and would not be in the ordinary posture for assessing credibility. The judge, conducting only a "hearing on the record that was made before the Office," might have nothing more than the ALJ's "summary of the evidence presented at the hearing" along with the "recommendations of the [ALJ]." Section 3–115(e) does not even require that a transcript of the hearing before the ALJ shall have been prepared, although it does require that the hearing shall have been recorded. Either party, of course, may have ordered a transcript and offered it before the judge. Section 3–115(e)(2) further provides that "[i]f the court orders a transcript, the court shall pay the costs of the transcript."

Again at the most fundamental level, what does § 3–118 direct the judge to do in the eventuality, a quite foreseeable eventuality, that 1) the judge is satisfied that the evidence before the ALJ was sufficiently "substantial," as a matter of law, to have persuaded the ALJ, but 2) that same evidence would not, as a matter of fact, persuade the judge? Is a § 3–118 hearing an administrative appeal or is it a *de novo* adjudication of the release criteria? Is § 3–118 concerned with the committed person's satisfaction of his burden of production before the ALJ or his burden of persuasion before the court? This statute urgently cries out for legislative clarification.

In the meantime, we must make an educated guess. If subsection (a) were all that we had before us, we would be hard-pressed not to conclude that the Legislature's use of the language of persuasion, "by a preponderance of the evidence," referred to the circuit court judge's personal decision on the ultimate factual merits of release. It is an oblique affirmative indication. A look at subsection (b), however, immediately tilts us back decidedly in the other direction.

Subsection (b)(1) deals with the situation in which no exceptions have been filed to the recommendations of the ALJ and the Board. In such a case, the court does not take evidence or presume to engage in fact-finding of its own. It simply reviews the report from the Office [of Administrative Hearings] to see if the ALJ's *"recommendations are supported by the evidence"* (emphasis supplied), and, if so, the court "shall enter an order in accordance with the recommendations." This is the classic language of administrative appeals. The court, in a quasi-appellate capacity, monitors the action that has been taken by the ALJ and determines whether the recommendations are supported by substantial evidence. It does not presume to second-guess the recommendations on their merits.

Subsection (b)(2) goes on to provide that if the circuit court judge is not going to follow the recommendations of the ALJ, the court must hold a hearing unless the hearing is waived.

This seems to be nothing but the affording of an opportunity to the lawyers to argue the case. Subsection (b)(1)'s actual criteria for accepting or not accepting the recommendations of the ALJ are not in any way changed by subsection (b)(2).

Subsection (e)(2)'s provision that an "appeal from a circuit court order" shall not be of right to the Court of Special Appeals but only "by application for leave to appeal" also is a further indication that this Court would not in such a case be reviewing a *de novo* decision of the circuit court but would only be entertaining an administrative appeal that had already enjoyed one level of judicial review. Notwithstanding the cryptic use of the language of persuasion in § 3–118(a), we are on balance convinced that the entire procedure spelled out in §§ 3–114 through 3–118 is an administrative procedure. Both the mandated judicial review of the administrative decision at the circuit court level and the subsequent discretionary review by this Court constitute an administrative appeal.

A quick look forward at § 3–119's procedure for handling a subsequent application for release by a committed person (we will be looking at § 3–119 in greater detail, *infra*) provides the "clincher" for our conclusion. Two separate and distinct modalities for adjudicating a committed person's eligibility for release or discharge are provided by § 3–119. It is the modality provided by subsection § 3–119(b) that embraces all of the "provisions of this title governing administrative hearing and judicial determination of eligibility for release" that we have thus far in this opinion been analyzing. All of this package of provisions is characterized by subsection (b) as the "Administrative procedure." It is starkly contrasted with the very different procedures provided by subsection (c) and there characterized by the distinct label of "Court procedure."

### The Uncontroversial First Review

The appellant's initial release hearing was in essential compliance with the statute. The appellant was committed to the Department on February 27, 2007. A hearing was held before

an ALJ on the appellant's eligibility for release on April 26, 2007, 58 days later.[1] Although the Department requested a conditional release so that the appellant could be sent to Virginia to address legal issues in that state, the ALJ's recommendation was for a release without conditions, to wit, a discharge from commitment. The conclusion of the ALJ and his recommendation of May 2, 2007, to the circuit court was that the appellant was eligible for an unconditional discharge:

> I have reviewed the verbal and written testimony of the witnesses, and have had the opportunity to observe the Patient as well. In general, the Patient appeared to be calm and forthright. *I must conclude that if the Patient has no psychiatric symptoms and does not pose a danger as a result of a mental illness, then he must be discharged.* Md.Code Ann., Crim. Proc. § 3–114(b) (2001). *Accordingly, I recommend that the Patient be discharged from confinement at the Hospital without conditions.*

(Emphasis supplied).

On June 12, 2007, the circuit court overruled that recommendation and released the appellant to Virginia authorities on the condition that he return to the Springfield Hospital Center after the resolution of his legal issues in Virginia. The judge's order of June 12, 2007, overruled the recommendation of the ALJ that the appellant be released without conditions. After granting a conditional release so that the appellant could be sent to Virginia to resolve the charges there pending against him, the final order of the court was

> that upon resolution of the charges in Virginia, *the Patient* shall be returned forthwith to Maryland and *shall be committed to the Department of Health & Mental Hygiene,* and be recommitted to Springfield Hospital Center, *for contin-*

---

**1.** Section 3–115(a) directs that such a hearing shall be held "[w]ithin 50 days after commitment" to the Department. Section 3–115(b), however, provides that such a hearing "may be postponed for good cause or by agreement of the committed person and the Health Department."

*ued institutional care and inpatient treatment until such time as the Patient becomes eligible for release.*

(Emphasis supplied).

The appellant returned to Maryland on July 27, 2007, and was recommitted. The appellant's initial release hearing was a *fait accompli* as of June 12, 2007. What is before us in this case is the second review of the appellant's eligibility for release. It is no mere continuation of the first review. The procedure for handling any second or subsequent release or discharge procedure is prescribed by either § 3–119 or § 3–120.

## This Was Not a § 3–119 Review

A second or subsequent effort by a committed person to obtain a release or discharge brings into play the unique package of procedures provided by § 3–119. The committed person enjoys in such a case an adjudicative flexibility that is available in no other situation under Title 3. The committed person may eschew entirely the administrative procedures provided by §§ 3–114 through 3–118 and may opt, instead, to have the judicial branch of government, judge or jury, decide on his eligibility for release or discharge in a completely *de novo* trial. The only limitation is that the committed person must choose the administrative modality or the judicial modality **BUT NOT BOTH.** He neither will be permitted nor will he suffer some polyglot combination of the two.

### A. Section 3–119's Time Restraints

Under § 3–119 there are, on the other hand, some uncompromising time restraints, and that is why the appellant here is fortunate that this is not a § 3–119 review proceeding. If it were, it would be dismissed. Subsection (a) controls the timing of such a subsequent application.

(a) *In general.*—(1) *Not earlier than 1 year after the initial release hearing ends* or was waived, and not more than once a year thereafter, *a committed person may apply*

*for release under either subsection (b) or (c) of this section, but not both.*

> (2) Notwithstanding the time restrictions in paragraph (1) of this subsection, *a committed person may file an application for release at any time if the application is accompanied by an affidavit of a physician* or licensed psychologist that states an improvement in the mental condition of the committed person since the last hearing.

(Emphasis supplied).

The appellant himself could not have brought before the Board or before the court the application for his release or discharge that is now being reviewed. Because the hearing on the first consideration of his eligibility for release or discharge had only ended on June 12, 2007, the appellant himself was not entitled, under § 3–119(a), to file a subsequent application for release or discharge before June 12, 2008. Although subsection (a)(2) provides that a subsequent application may be filed at any time "if the application is accompanied by an affidavit of a physician or licensed psychologist that states an improvement in the mental condition of the committed person since the last hearing," there was no such affidavit in this case, and subsection (a)(2)'s exception to the filing limitation would not have been applicable. Any application filed by the appellant less than two months, as opposed to one year, after the termination of the June 12, 2007, hearing would have been a nullity.

### B. Section 3–119's Unique Adjudicative Flexibility

Although the procedure being reviewed in this case is not one pursuant to § 3–119, subsections (b) and (c) of that section shed ultimate and dispositive light on the administrative versus judicial tension that has been bedeviling us on our consideration of this appeal. Title 3 generally contemplates an exclusively administrative resolution of a committed person's release eligibility except in one special circumstance. Once a committed person has been denied release or discharge after an initial review, regardless of which party initiated that

review, the committed person may, after a year has gone by, file an application for release or discharge. That committed person then has a choice of trial modes. Subsection (a)(1) provides the choice of an administrative procedure or a court procedure, but explicitly states that the procedure chosen must be one or the other **BUT NOT BOTH.**

The first of those procedural modalities is the "Administrative procedure" provided by subsection (b).

(b) *Administrative procedure.*—(1) To apply for release under this subsection, the committed person shall file an application for release with the Health Department and notify the court and State's Attorney, in writing, of this request.

(2) *The provisions of this title governing administrative hearing and judicial determination of eligibility for release apply to any application for release under this subsection.*

This procedure incorporates the fuller explication of the administrative procedure spelled out by §§ 3–114 through 3–118. Those are the "provisions of this title" referred to by subsection (b)(2).

The second procedural modality is that provided by subsection (c). As distinct from the "Administrative procedure" of subsection (b), it is designated as the "Court procedure."

(c) *Court procedure.*—(1) To apply for release under this subsection, *the committed person shall file a petition for release with the court that ordered commitment.*

(2) The committed person shall send a copy of the petition for release to the Health Department and the State's Attorney.

(3) *If the committed person requests a trial by jury, the trial shall be held in a circuit court with a jury as in a civil action at law.*

(4) *The trier of fact shall:*

(i) *determine whether the committed person has proved eligibility for release by a preponderance of the evidence;* and

(ii) render a verdict for:

1. continued commitment;

2. conditional release; or

3. discharge from commitment.

(5) If the trier of fact renders a verdict for conditional release, within 30 days after the verdict, the court shall release the committed person under conditions it imposes in accordance with specific recommendations for conditions under § 3–116(b) of this title.

(Emphasis supplied).

Should the committed person choose the "Court procedure," he may then select a court trial or a jury trial. If a jury trial, subsection (c)(3) provides that it shall be "as in a civil action at law." There will be in such a proceeding, court or jury, no antecedent administrative activity such as a hearing before an ALJ, recommendations by an ALJ, or exceptions thereto. It will be a court proceeding and only a court proceeding from the outset. Should a judge, rather than a jury, be selected as the fact finder, the judge will determine whether eligibility for release has been proved by a preponderance of the evidence and will render a verdict accordingly. This is no mere replication of the judge's doing precisely the same thing under the very distinct "Administrative procedure." The judge's role is different in the two procedural contexts. In *Anderson v. Department of Health and Mental Hygiene,* 310 Md. 217, 221, 528 A.2d 904 (1987), Judge Eldridge described this judicial procedure under the substantively similar predecessor provision.

Once committed for an indefinite period, a defendant could periodically request to be released. *He could choose either an administrative proceeding with judicial review, or a direct statutory judicial proceeding,* or a habeas corpus

proceeding. *Section 12–114(c) authorized the direct judicial release proceeding, either with or without a jury.* (Emphasis supplied).

As important as are the two adjudicative modalities available to a committed person seeking release, equally important is § 3–119(a)(1)'s unequivocal direction that the committed person must choose the "Administrative procedure" or the "Court procedure" **BUT NOT BOTH.** They do not combine. Had the review now before us been one initiated by the appellant pursuant to § 3–119, the procedure before the circuit court would have been fatally flawed, even were we to assume, arguendo, that the filing of the application had been timely. The procedure chosen by the applicant would obviously have been the "Administrative procedure" pursuant to subsection (b), for there could be no other explanation for why there was a hearing before ALJ Alyce Rojugbokan on August 23, 2007. This review was indisputably moving along the administrative track. Had the appellant opted for the "Court procedure" pursuant to subsection (c), the case would have gone straight to the court and the Office of Administrative Hearings would not have been involved. As of the December 4, 2007, hearing before the circuit court, however, the review had completely jumped the tracks and was on the different "Court procedure" track pursuant to subsection (c), as evidence was taken and witnesses testified just as in a judicial proceeding. It is the clear command of subsection (a)(1) that the review may not straddle two divergent review modalities.

### Section 3–120

The application for the appellant's release that was denied by the circuit court on December 19, 2007, and that is now before us on this appeal, was not an application filed by the appellant pursuant to § 3–119. If, indeed, there was any authorization for the review that is now before us on appeal, it would appear, by process of elimination, to have been pursuant to § 3–120. Subsection (a)(1) provides:

If *at any time* the Health Department considers that a committed person is eligible for conditional release, *the*

*Health Department may apply* for the conditional release to the court that committed the person.

(Emphasis supplied).

## A. Absence of Any Time Restraint

█ Unlike a second or subsequent application for release filed by a committed person, which may not follow the termination of an earlier hearing by less than one year, an application for release filed by the Health Department itself labors under no such time restraints. In this case, this second review proceeding was initiated by the Health Department. The appellant recites in his brief that "[a] second petition for release was filed by the Department." Following the appellant's return from Virginia and his readmission to the Springfield Hospital Center on July 26, 2007, the present review process seems to have started with a letter of August 14, 2007, to the Office of Administrative Hearings from Dr. Natahi Purvis, the appellant's treating psychiatrist at Springfield. Her recommendation was unequivocally for the appellant's unconditional discharge:

> Since Mr. Byers' admission on 7/26/07, he has not exhibited any evidence of psychiatric illness or symptoms. The patient has a past history of being diagnosed with Bipolar Disorder NOS, History of Alcohol and Cannabis Abuse on Axis I. Axis II: Personality Disorder with Antisocial Traits. Axis III: None. *The patient is currently not taking medication. The patient has not been prescribed any psychiatric medication since March of this year, under his previous admission to Springfield Hospital Center. At that time it was felt that the patient's psychiatric symptoms were in remission and he was not in need of further psychiatric medication treatment.* He has remained off medication since March, and *remains symptom free.* At the present time it is felt that the patient is not exhibiting any symptoms of a mental disorder nor is it felt that he will exhibit symptoms of a mental disorder in the immediate future that will require psychiatric treatment. Although he has exhibited symptoms in his past history, *he has re-*

*mained unmedicated and symptom free during his hospitalizations at Springfield.* At the present time *it is felt that he is not dangerous to self or others and is not in need of further psychiatric hospitalization or treatment.* Furthermore, it is felt that symptoms exhibited in the past were secondary to Axis II Personality Disorder, which again does not require further inpatient hospitalization and treatment. **Opinion on Release:** *It is my best medical judgment that Sherwood Byers would not, by reason of mental disorder, be dangerous to himself or the person or property of others if released from the hospital. Mr. Byers does not currently exhibit any mental illness and will not require treatment for mental illness symptoms in the near future. Therefore, we recommend an Unconditional Release for Mr. Byers.*

(Emphasis supplied).

The Health Department accordingly recommended that the appellant be discharged unconditionally, and the routine administrative procedure went into operation. A hearing was conducted by the Office of Administrative Hearings on August 23, 2007. The ALJ filed her Report on Release Eligibility and her Recommendation on August 30, 2007. The Recommendation was that the appellant be discharged from commitment without conditions.

If this review of the appellant's eligibility for release was pursuant to § 3–120, it was timely. Even if it was not pursuant to § 3–120, however, the review was clearly not pursuant to § 3–119, and that is the only section of the statute that imposes a time limit on the filing of an application for release. In its Findings, Conclusions and Order of December 19, 2007, the circuit court treated the matter before it as "a hearing pursuant to ... § 3–117." None of the parties, incidentally, filed any exceptions to the ALJ's findings and recommendation.

## B. Discharge Versus Conditional Release

Although we have nominated § 3–120 as the most likely vehicle to have carried forward the review of the appellant's

eligibility for discharge or conditional release, that nomination faces one not insignificant hurdle. Section 3–120 is entitled "Conditional release request by Health Department." Subsections (a)(1) and (a)(2) both refer expressly to "conditional release." Subsection (b) limits the court's action to "continued commitment" or "conditional release." The Health Department's recommendation that triggered this review, however, was not for a conditional release but was for a total discharge without conditions. Strangely, there is no comparable provision to § 3–119 for the Health Department's application for a committed person's unconditional discharge. Is the apparent incongruity just a matter of slack statutory phrasing? Or is there some rationale that we fail to appreciate?

Looking at Title 3 as a whole, §§ 3–114, 3–116, and 3–118 all expressly distinguish between a "discharge" and a "conditional release." Both § 3–115 and § 3–119 use the term "release hearing" in a generic way that embraces both conditional release and unconditional discharge as possible results of the "release hearing." That the term "release" is generic enough to embrace both conditional release and discharge by no means implies the converse, that the more specific term "conditional release" possesses such linguistic elasticity. On the other hand, we can imagine no conceivable reason why the Health Department should be entitled at any time to apply for a committed person's conditional release but not for that person's unconditional discharge. Should the General Assembly ever have the occasion to review Title 3, it would behoove it to address, or at least to consider, this issue.

## C. Section 3–120 Sets Out An Administrative Procedure

■ Just as §§ 3–114 through 3–118 contemplate an administrative procedure subject to administrative appeal, so does § 3–120. It is only § 3–119, a subsequent application for release by a committed person, that affords the possibility of a court procedure, not in combination with but as an alternative to an administrative procedure. It is a procedural option in that one limited context and is not otherwise available.

### The Nature of the Review in This Case

■    On the basis of an exhaustive, and perhaps exhausting, examination of Title 3, we cannot help but conclude that the trial judge in this case was procedurally in error in making a judicial decision on the ultimate merits rather than confining herself to the more limited role of monitoring what was essentially an administrative appeal. The error was eminently understandable because the statute does not always give unmistakable marching orders. In an effort to reach a proper decision on the ultimate merits, moreover, the court allowed what seemed to begin as a more limited administrative review to transmute into what became a "Court procedure" within the contemplation of § 3–119(c). Because there is no provision for such a "Court procedure," except in the limited context of a § 3–119(c) review, the resort to such a procedure in this case was in error.

Movement on the administrative track began with the August 14, 2007, letter of Dr. Purvis, representing the Department, to the Office of Administrative Hearings that recommended the unconditional release of the appellant. Movement along that administrative track then continued as a hearing was conducted, pursuant to § 3–115(e), before an ALJ on August 23, 2007. Following that hearing, the next stop on the administrative journey was the forwarding of the ALJ's summary of the evidence and her recommendation that the appellant "be released from confinement without any conditions" to the circuit court on August 30, 2007. § 3–116. No exceptions were filed to that recommendation.

The administrative momentum continued unabated as the court on its own initiative, pursuant to § 3–117(a)(1), decided to hold a hearing on September 8, 2007. At that hearing, the court heard arguments from counsel, as contemplated by § 3–117(b). At the conclusion of that hearing, the judge determined that a further hearing was necessary and scheduled it for October 24, 2007. At that second hearing of October 24, the court heard further argument from counsel for 1) the appellant, 2) the Department, and 3) the State's Attorney's

Office. This was still within the framework of an administrative procedure.

At that hearing, however, a procedure that had theretofore been discreetly administrative suddenly began to take on the coloration of a *de novo* judicial proceeding as live testimony was taken from the appellant. We can find no warrant in § 3–117 specifically nor in Title 3 generally for the taking of testimony by the circuit court. Section 3–117(b)(3) expressly provides that the court, should it need more evidence, may "remand for the Office to take additional evidence."

The subtle but unmistakable drift from an administrative proceeding into a judicial proceeding continued as the court decided that "a further hearing was needed in which testimony from Springfield Hospital personnel could be received." That third hearing was held on December 4, 2007, and again live testimony was taken, both from Dr. Purvis and from Colleen Brady, the appellant's social worker. At that point, the judge was unquestionably behaving as a judicial fact finder preparing to rule on the ultimate merits. The court spelled out the predicate for its ruling:

> *Based upon* a review of the record, evidence before the OAH and the arguments presented at the hearings on September 28, 2007, October 24, 2007 and December 4, 2007 and the *testimony presented,* this Court makes the following determinations.

(Emphasis supplied). That was no judicial review of an administrative action based "on the record that was made before the Office." § 3–117(b)(1).

Had the trial judge been authorized by Title 3 to make the ultimate decision on the merits, we would unhesitatingly have affirmed her decision to deny the application for the appellant's unconditional release. The burden of proof would have been on the appellant, and the appellant simply failed to persuade the trial judge. We would not have agreed for a moment with the appellant that Dr. Purvis's testimony in favor of unconditional release was so decisive and irrefutable that it would have compelled the fact finder to be persuaded.

We would note that it is nearly impossible for a verdict to be clearly erroneous or an abuse of discretion or legally in error when it is based not on a fact finder's being persuaded of something but only on the fact finder's being unpersuaded. We explained this distinction in *Starke v. Starke,* 134 Md.App. 663, 680–81, 761 A.2d 355 (2000):

> [I]t is far easier to sustain as not clearly erroneous the decisional phenomenon of not being persuaded than it is to sustain the very different decisional phenomenon of being persuaded. Actually to be persuaded of something requires a requisite degree of certainty on the part of the fact finder (the use of a particular burden of persuasion) based on legally adequate evidentiary support (the satisfaction of a particular burden of production by the proponent). There are with reasonable frequency reversible errors in those regards. Mere non-persuasion, on the other hand, requires nothing but a state of honest doubt. It is virtually, albeit perhaps not totally, impossible to find reversible error in that regard.

See also *Pollard's Towing v. Beman's Body Frame,* 137 Md.App. 277, 289–90, 768 A.2d 131 (2001) ("Far less is required to support a merely negative instance of non-persuasion than is required to support an affirmative instance of actually being persuaded of something.").

That Dr. Purvis's testimony might not, hypothetically, have been so overwhelming as to have compelled the trial judge to be persuaded on the ultimate merits is, of course, beside the point. It was not the trial judge's responsibility to be persuaded. Dr. Purvis's testimony, moreover, had no business being directly before the trial judge. The appellant's burden, rather, was to persuade the ALJ and the Department. He carried that burden and they were persuaded. It is true that an ALJ's recommendation, even if approved by the Department, would not, as would a more routine decision by an administrative agency, take effect unless and until a trial judge signed off on it. The trial judge must approve the recommendation of the ALJ. The burden of this opinion, however, has been to establish that that required approval,

except in the rare circumstance dealt with by § 3–119(c), contemplates the review of and approval of the propriety of the administrative procedure and the legal sufficiency of the evidence to support the administrative decision. It does not contemplate, except in a § 3–119(c) situation, an independent taking of evidence and a *de novo* arrival at the same decision. To approve of something is not necessarily to agree with it.

A remand of this case is not necessary, except for the formality of having the circuit court adopt the ALJ's recommendation. Once it is established that we are dealing with what is essentially an administrative appeal, the appellate court looks not so much at the trial judge as it looks through the trial judge to the antecedent administrative decision itself. In this case, the evidence before the ALJ on August 23, 2007, was substantial enough to support the conclusions and the recommendation of the ALJ. The ALJ thoroughly summarized the evidence upon which she based her recommendation.

*I find that the Patient has sustained his burden to prove eligibility for conditional release. The Forensic treatment team* working with the Patient *unanimously recommended the Patient's release from confinement without any conditions,* as it was their opinion that *the Patient would not be a danger,* as a result of a mental disorder, *to himself or to the person or property of others* if released. Further, Dr. Purvis opined that *the Patient has reached the maximum benefit from an inpatient course of treatment.* The Patient was admitted twice to the Hospital. The Patient was first admitted from March 2, 2007 through June 12, 2007 and again from July 26, 2007 to present. *During both admissions, the Patient has not needed any psychiatric medication. The Patient has been cooperative, has participated in activities on the unit and has not required any emergency medications, seclusion or restraint.* Consequently, *Dr. Purvis recommended an unconditional release since the Patient does not display any symptoms of mental illness.* On cross-examination, Dr. Purvis explained that *the Patient's case was presented to the Hospital forensic review board,* which included: Lawrence Raifman, Psychologist and

the head of the Forensic Department, Eric Roskes, Psychiatrist and Dr. Julie Smith, the Hospital Presenter. She noted that Dr. Raifman was the psychologist who initially evaluated the Patient and on February 5, 2007 found that he was competent to stand trial.

. . . .

The Patient detailed his progression from the isolation unit to general housing while at the detention center in Virginia. In September 2005, he began his incarceration in the isolation unit with other inmates with psychiatric conditions. In November 2005, the Patient was moved from isolation to general population but was not able to cope in the environment. Sometime in December 2005, he was again reintegrated into the general population with great success. *Even though his medication was stopped, the Patient was still able to follow the rules and procedures, perform day-to-day tasks and interact with fellow inmates without incident.* The Patient remained in general population until his release in 2007. The Patient, now 23 years old, did drink alcohol when he was underage. He was also introduced to marijuana at an early age, and has never used it since. As a result, neither drugs nor alcohol have interfered with his life.

*The Patient plans to return to work.* He was confident of his ability to find suitable employment because he had experience in a variety of fields as a brick layer, grocery store clerk and bike messenger. *The Patient, however, plans to pursue specialized training in the electrical field, so he will have more options. The Patient now experiences mental clarity and intends to seek psychiatric treatment should his condition decline.* He is grateful that his parents are intimately involved in his life and looks forward to returning home. Further, he has such a close relationship with his parents that he would promptly follow their advice should they notice any decline in his condition.

*Therefore, I recommend that the Patient be released from confinement without any conditions.*

(Emphasis supplied). That unquestionably was substantial evidence to support the recommendation.

Our reading of Title 3 is that it establishes what is essentially an "administrative procedure" and not a "court procedure." Title 3 may not, to be sure, be the best or the clearest of all possible statutes, but it is the only statute we've got. If some tweaking or amending is required, that is something for the Legislature and not for the courts to undertake.

**JUDGMENT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER ACTION CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**